**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-22-2025**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
      XIAOTIAN LIU                  *
                                    *  25-cv-133-SE
              v.                    *  April 9, 2025
                                    *  11:12 a.m.
KRISTI NOEM, SECRETARY OF THE       *
DEPARTMENT OF HOMELAND SECURITY;    *
AND TODD LYONS, ACTING DIRECTOR OF  *
THE IMMIGRATION AND CUSTOMS         *
ENFORCEMENT                         *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE SAMANTHA D. ELLIOTT


APPEARANCES:

For the Plaintiff:          Sang Yeob Kim, Esq.
                            Gilles R. Bissonnette
                            American Civil Liberties Union of NH


                            Ronald L. Abramson, Esq.
                            Shaheen & Gordon, PA




For the Defendants:         Raphael Katz, AUSA
                            U.S. Attorney's Office




Court Reporter:             Susan M. Bateman, RPR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, NH 03301
                            (603) 225-1453

1          P R O C E E D I N G S

2          THE CLERK:  Court is in session and has for

3  consideration a motion hearing in Xiaotian Liu versus Kristi

4  Noem, civil case number 25-cv-133-SE.

5          Can I have counsel identify themselves for the

6  record, beginning with counsel for the plaintiff, please.

7          MR. KIM:  Good morning, your Honor.

8          Sang Yeob Kim for plaintiff.

9          MR. ABRAMSON:  Good morning.

10          Ronald Abramson on behalf of the plaintiff.

11          MR. BISSONNETTE:  Good morning, your Honor.

12          Gilles Bissonnette on behalf of the plaintiff.

13          MR. KATZ:  Raphael Katz for the government.

14          THE COURT:  Good morning everybody.

15          Okay.  Thanks for your patience.

16          All right.  Before we begin, I just want to clarify

17  for the record -- we had some conversations at the status

18  conference on Monday about whether your motion for a temporary

19  restraining order would actually be treated as a motion for a

20  temporary restraining order or whether we would ultimately

21  treat it as a motion for a preliminary injunction but in an

22  expedited manner.

23          My intention today given the recent developments of

24  late last night and early this morning is to treat it as a

25  motion for a temporary restraining order.  I understand that

1    there's notice and that typically a TRO doesn't have notice.

2    Obviously, the government is here and the government has had

3    notice of this suit even prior to filing of the suit and that

4    the parties -- I appreciate your cooperation in working

5    together to make sure that the government knows what's going

6    on and the government's efforts to make sure that the

7    plaintiffs are aware of the status of your ability to respond,

8    but given the fact that the government has indicated its

9    inability to provide a true substantive response both legally

10   and factually to the allegations in the complaint and the

11   allegations in the motion until later, either early or late

12   next week, and the inability of the government to commit to

13   either not detaining or not deporting the plaintiff in this

14   case, you know, the plaintiff has asked me to consider this

15   motion today.

16           As a result, I'm going to consider it as a motion

17   for a temporary restraining order.  So I just wanted to

18   clarify that for the record.  So I'm not transforming this

19   into a motion for a preliminary injunction at this point which

20   means that we're not really going to be considering this on

21   the robust record that we might otherwise consider it when

22   there's been notice provided.

23           So if you're looking at other cases in which

24   there's been notice on a request for a temporary restraining

25   order, I don't think this case is really going to be

1  comparable.  This is more akin to a traditional temporary

2  restraining order case.

3          Does everybody agree with me on that?

4          MR. KIM:  Yes, your Honor, for plaintiff.

5          THE COURT:  Okay.

6          MR. KATZ:  Yes, your Honor.

7          THE COURT:  Okay.

8          All right.  It's the plaintiff's motion.  You can

9  trust I've read everything carefully as much as I could.  I

10  mean, there were supplements I received this morning, but I am

11  interested in hearing your argument as you see fit.

12          As you know, I have a tendency to interrupt with

13  some questions, but I do want to hear from you.

14          MR. KIM:  Yes, your Honor.

15          Sang Yeob Kim for plaintiff.

16          Your Honor, because of the nature of the temporary

17  restraining order I want to start with the irreparable harm,

18  why there is the need for urgency and why the Court should

19  intervene and provide a very short and temporary relief until

20  the plaintiff can go into the preliminary injunction stage.

21          That's really -- the main harm is the possibility

22  of the immigration detention and deportation, and that's the

23  portion of the harm that plaintiff hoped to achieve through

24  the agreement with the defendants.

25          Regrettably, that did not occur last night, and

1    it's our understanding that defendants cannot promise, cannot

2    assure that no detention or no arrest would happen.

3              So that's the imminent potential of threat and harm

4    to the plaintiff, and that is related to the merits of the

5    case obviously because the case is very unprecedented in a way

6    that it's unclear whether he is currently out of student

7    status or not.

8              The government -- you know, it appears that the

9    defendant's notification of the termination through the SEVIS

10   record, which is the student -- the database, indicates that

11   his student status has been terminated and also as well as the

12   revocation of the visa.  What that means is the government has

13   the ability and can detain plaintiff at any time and place him

14   in legal proceedings.

15             And for that -- even though we are not challenging

16   the revocation of his visa itself, instead we are only

17   challenging the termination of his F-1 student status, that

18   portion can serve as a critical and powerful form of defense

19   and relief in legal proceedings.

20             So that's the main irreparable harm that we think

21   that exists at this moment.

22             On top of that, because of the termination of his

23   F-1 student status the school is not allowing plaintiff to

24   engage in any research, and that's critical because he -- the

25   plaintiff is a doctorate student, a second year student, and

1    he needs to engage in research for both financial assistance

2    from the school as well as that's the core component of his

3    doctorate program.

4            So right now the school at least allows him to

5    enroll in classes and that would allow him to maintain full

6    course of study which goes into whether he's complying with

7    the regulation, but that doesn't really -- I don't want to say

8    it's not meaningful, but that does not meet the progress of

9    his Ph.D. program because he has to engage in the research

10   work and that just cannot happen until this Court intervenes

11   in this case through the temporary restraining order.

12           THE COURT:  Can I ask you --

13           MR. KIM:  Yes.

14           THE COURT:  Is it clear how long he can fail to

15   engage in research?  You know, I don't have any other

16   information about his financial wherewithal and I don't have

17   any information about how long he can pause his research and

18   still maintain his progress towards his degree.

19           MR. KIM:  It is unclear at this moment because --

20   so ordinarily the Ph.D. program allows a student to receive

21   through the teaching assistantship or research assistantship

22   and then hopes the student finish, for example, within five or

23   six years because the school is paying for the research and

24   the student needs to finish it.

25           Now, because of this termination he cannot --

1    because he cannot engage in any research class at this moment,

2    he will likely have to delay one more semester after his Ph.D.

3    program because -- even though we don't know what will happen

4    in this action at this moment, because he's already enrolling

5    for the regular classes, not research class, that will -- I

6    don't know how that will affect -- whether that's -- like, six

7    month of delay or one year of delay, whether that would

8    actually affect even the school, to force a school to

9    terminate his Ph.D. program if he cannot finish within four

10   years.  That -- we don't have information yet, but what's

11   clear is that definitely affects progress of his Ph.D.

12   program.

13           THE COURT:  And if the Court were to grant the

14   temporary restraining order as requested, will that remedy

15   this situation?  I mean, he's already been prevented from

16   participating in research.  My understanding is it's only been

17   a few days.

18           MR. KIM:  Correct.

19           THE COURT:  That's my question is, how long can

20   that go?  You know, if I were to grant the temporary

21   restraining order today or tomorrow, is that soon enough to

22   stop that interference?  If I were to grant preliminary

23   injunctive relief two weeks from now, is that soon enough to

24   stop that interference?

25           MR. KIM:  I don't think -- so I don't have a

1    definite answer.  However, the two weeks would be a little bit

2    late because now he is in the process of changing his course

3    from research credit to the regular lecture classes.

4              THE COURT:  Okay.

5              MR. KIM:  And what we hope to see is -- even though

6    we don't know Dartmouth College's position about this, what we

7    hope to achieve -- for examine, if the Court grants TRO today

8    or tomorrow, we plan to go back -- we plan to reach out to

9    Dartmouth College so that plaintiff can actually return back

10   to the research, the credit, so that the student plaintiff

11   doesn't need to enroll in regular classes but instead doing

12   the research that he has been doing.

13             THE COURT:  Okay.  Understood.

14             MR. KIM:  So two weeks -- to answer, two weeks of

15   the time might be untimely for the purpose of going back to

16   the research, the credit and course.

17             THE COURT:  Okay.  Thank you.

18             MR. KIM:  So based on that, plaintiff believes the

19   irreparable harm prong has been met and satisfied, and I'm

20   going to go into the likelihood of success.

21             THE COURT:  Okay.

22             MR. KIM:  So we have two claims.  One is due

23   process claim on the Constitution.  The second claim is APA

24   claim.

25             So let me start with the due process claim.  So the

1   core basic principle of due process is notice and a meaningful

2   opportunity to respond.  None has been provided in this case.

3   The school did not receive any notice twice.  The first time

4   the school found out about the plaintiff's status when the

5   school was inspecting the SEVIS record on its own.  It's not

6   that the defendants notified the school about the termination

7   of the status.  Even when the school found out about the

8   updated status of the SEVIS record, it was not that defendants

9   provided that notice to the school or even to plaintiff.  So

10  there was no notice.

11         And even that explanation showing in the SEVIS

12  record does not provide any sufficient and adequate

13  explanation as to why his student status was terminated.  It

14  merely indicates that the initial notation was otherwise

15  failure to maintain status in the middle of the criminal check

16  and/or the visa was revoked, but student has maintained his

17  status and his school has not terminated his status.  It's

18  usually the school that officially is the one.  DSO is the one

19  who inspects.  And if the student does not maintain the

20  status, then DSO is the one who initiates the termination.

21         THE COURT:  Maybe you can explain this to me.  So

22  your supplement from this morning -- my understanding is that

23  that supplement clarified that it wasn't an issue about

24  maintaining status.  That now there's a clarification that

25  it's either that he came up on a criminal records check or

1    that his visa was revoked.

2              Am I understanding that supplement correctly?

3              MR. KIM:  Yes, that's the correct summary of the

4    supplement because that's the current updated status record,

5    and it appears that that has been consistent with all other

6    similarly situated students of this updated SEVIS.

7              So putting aside the issue of the failure to

8    maintain status -- so if crime is an issue that forced

9    defendants to terminate student status, then they have to have

10   explanation as to what charges, convictions that he has been

11   accused of.

12             THE COURT:  Under the Fifth Amendment?

13             MR. KIM:  Correct, your Honor.

14             And principally because plaintiff has not committed

15   any crime.  Not even parking ticket.  He doesn't even drive.

16   He doesn't even have driver license because he doesn't want to

17   get parking ticket.

18             The only thing that he has done was studying really

19   well, and as his master's program GPA shows, he got 4.0 out of

20   4.0.  That's the only thing that he has done, studying since

21   2016, to become a computer scientist, to become a scholar in

22   that field.

23             So if the government defendant has a reason to

24   notify him about the criminal basis, then they have to explain

25   more than just merely criminal check.

1          And if the government -- I understand that the

2     defendant might not be ready to respond, but if the defendants

3     want to rebut that claim that he actually has been accused of

4     a crime and he has conviction, then defendant should have

5     provided that evidence.  But I -- as far as I know, I'm not

6     aware of such rebuttal evidence or --

7          THE COURT:  I'm going to stop you right there, and

8     I'm going to give the government an opportunity to respond to

9     that.

10          Is the government prepared right now -- and I'm

11     sorry, the way the courtroom is set up I can't see the

12     government's counsel around you.

13          Is the government prepared to respond to the

14     plaintiff's status, status or SEVIS status today?

15          MR. KATZ:  No, your Honor.

16          We have -- I've begun this case yesterday, and

17     since then I've conferred repeatedly with ICE counsel and

18     Office of Immigration Litigation counsel, and we are seeking

19     right now to determine all those facts about the status that

20     has been raised, but we do not have them right now.

21          THE COURT:  So can you tell me whether -- at this

22     point can you even tell me whether this is intentional or a

23     mistake?

24          MR. KATZ:  I cannot.  I do not know the answer as

25     to anything regarding the status at this point.  I'm still

1    gathering that information right now.

2            And, again, I've been in talks with ICE, they are

3    working hard on getting that, but it's only been two days and

4    they have not gotten that information yet.

5            THE COURT:  Okay.  So right now what I have in

6    front of me for the record is I have an affidavit from an

7    attorney authenticating a document, a government document

8    which is a printout from a government maintained website, and

9    I want you to correct me if I'm wrong because I'm trying to

10   figure out what I have in front of me.  It's a government

11   maintained website, right?

12           MR. KIM:  If I may, technically it is the e-mail

13   from Dartmouth College.  We copied and pasted it from the

14   SEVIS record.

15           THE COURT:  Okay.

16           MR. KIM:  What happened was Dartmouth College found

17   out about that notation in the status and copied and pasted IT

18   into the e-mail and notified the plaintiff.

19           So technically we don't have the screenshot of the

20   SEVIS record itself.

21           THE COURT:  Okay.  Give me one second.  I'm sorry.

22           (Pause)

23           Okay.  So I have an e-mail from Dartmouth College

24   and Dartmouth College is representing in the e-mail that this

25   is a screenshot of what they can access on the government

1  website.

2            MR. KIM:  I apologize, but technically not the

3  screenshot, but they copied and pasted that exact notation as

4  quotation -- as a quote from SEVIS record into the e-mail.

5            So they did not -- for example, they did not take a

6  screenshot of the SEVIS record.  What they did was this is

7  what the SEVIS record shows in terms of what happened to you

8  in terms of the status, and then they quoted, copied and

9  pasted the quotation, the quote from the SEVIS record into the

10  e-mail.

11            THE COURT:  Okay.  But that's the only information

12  thus far that's been available to the plaintiff about his

13  status?

14            MR. KIM:  That's correct, your Honor.

15            THE COURT:  Okay.  Just for clarification sake, is

16  the plaintiff arguing that if he -- I know this is a

17  hypothetical and I know how much attorneys hate hypotheticals,

18  but is the plaintiff arguing that if he knew he had committed

19  a crime or had been accused of committing a crime, that his

20  due process rights would be violated if his status were

21  revoked without the government stating exactly what crime was

22  committed?

23            MR. KIM:  So it depends -- so I have two responses,

24  your Honor.

25            Number one response is it's a hypothetical.  So

1   depending on the sufficiency of the explanation.  So, for

2   example, even if plaintiff admits that he has been accused of

3   the crime, if the government notice merely says you have been

4   accused of the crime, that's not enough.  It has to be more

5   than that, a little bit more specific as to which conviction,

6   which crime.

7         Plus, even if the notice prong of the due process

8   requirement is satisfied, there's a second prong from the --

9   based on the case that we cited from the First Circuit, the

10   meaningful opportunity to respond, and that's pretty important

11   because there could be some mistakes that are happening.  From

12   the government's perspective, maybe through the database

13   search this person was flagged with some sort of accusation of

14   the crime or conviction, but that may not mean that this

15   person actually is the person who committed the crime or

16   convicted of a crime, which is why the meaningful opportunity

17   to respond is a critical point whether that factual allegation

18   is correct or not, and that did not even exist, and that did

19   not even exist for the school.

20         So here the defendant is provided no notice,

21   provided no meaningful opportunity to respond, and today

22   during this hearing defendants cannot even ascertain and

23   verify whether his status has been terminated or not, but

24   problem is because of the SEVIS record termination notation

25   the school is not allowing -- school cannot because they still

1   have to comply with -- the regulation is not allowing

2   plaintiff to enroll in research class.

3           So the harm is real regardless of whether the

4   government actually made a mistake of putting that notation

5   into the SEVIS record or intentionally included that

6   information into the record, but because of that ambiguity

7   because no one can ascertain what actually happened and the

8   real reasons why that notation was included in the SEVIS

9   record, the harm -- the plaintiff is suffering from the

10  termination notation in the SEVIS record.

11          THE COURT:  Do you have any -- I mean, I've

12  obviously looked at your briefing and we've done some of our

13  own research, but we're all on the same tight timeline here.

14          Do you have any case law that I can review that

15  would give me some guidance of other courts that have applied

16  these same Fifth Amendment due process protections in context

17  either identical or at least similar to this?

18          MR. KIM:  Unfortunately, no, at least based on

19  our -- the short period of exhaustion of the research.

20          I think that's because this has never really

21  happened.  This is unprecedented.  And, again, it's usually

22  the school's DSO terminates the status or suggests to

23  terminate the status because, for example, the student was

24  convicted of a crime with a crime of violence or the student

25  is not attending the classes, he's not complying with the

1    regulation, but here it -- even the school has no idea what is

2    happening, and defendants unilaterally terminate or at least

3    at a minimum included that notation into the SEVIS record

4    forcing the school to pretty much pushing him out of the

5    research, the assignments, and treating him like he is

6    currently out of status.

7            So because of this unprecedented situation -- and

8    the plaintiff's counsel have been attending and speaking with

9    so many other attorneys just to verify whether this has ever

10   happened, whether there's any example of precedent that

11   actually happened addressed by other courts.  We have found

12   none.  And I have personally spoke -- we have spoken with at

13   least fifteen attorneys who have been in this field of the F-1

14   student status, and none of them actually have seen this type

15   of situation.

16           So unfortunately we are not aware of any on point

17   case law other than the Third Circuit case law Jie Fang which

18   at a minimum provides this Court jurisdiction on their APA

19   claim because the defendant's decision to terminate F-1

20   student status is a final action and that constitutes -- that

21   provides this Court restriction under APA to review whether

22   that termination was unlawful or lawful.

23           THE COURT:  Okay.  We'll get to that one in a

24   second.

25           Okay.  Is there anything else that you want to say?

1          I'll give you an opportunity to come back to this.

2   I want to exhaust -- anything you want to say today and

3   anything you want to put on the record, you'll have an

4   opportunity to do that.

5          I want to see if the government has anything else

6   you want to add at this point on this Fifth Amendment due

7   process argument.

8          MR. KATZ:  I have -- well, I want to start with

9   responses as to the reason we're here on detention, but if you

10  wanted to talk specifically about the due process piece, I do

11  have something to say regarding to the extent we're talking

12  about the visa, you know, removal of the visa.

13         THE COURT:  If you -- I mean, it's okay with me.

14  You can go ahead and talk about -- we did start with the

15  plaintiff's argument about the risk of detention.  So if you

16  would like to go ahead and talk about the risk of detention

17  first, that's okay with me.  We can jump around.  I can

18  follow.

19         MR. KATZ:  Thank you, your Honor.

20         So as you know, plaintiff started by explaining why

21  we're here largely is because of the risk of detention and

22  removal and that it couldn't get assurances from the

23  government as to that, and unfortunately the government can't

24  make any representations on ICE enforcement priorities.

25         But because the main concern here is detention, I

1   want to start with that.  You know, I want to talk a little

2   bit about the detention and removal process, and, you know,

3   the bottom line is that it's not something plaintiff can ask

4   the Court to do, to enjoin ICE from implanting its enforcement

5   authority, and just to talk a little bit about that.

6           So if ICE would determine that plaintiff was

7   subject to removal, he would be provided with due process in

8   the form of a notice and opportunity to respond.  He gets

9   what's called a notice to appear which is --

10          THE COURT:  I'm going to be very rude and interrupt

11  you for a second.

12          I will let you put anything you want on the record,

13  but I just want to clarify that the only request -- let's

14  focus this very specifically on the request that's in front of

15  the Court today because the preliminary injunction request

16  here is a request that the Court enjoin the government from

17  terminating the plaintiff's F-1 student status under SEVIS and

18  require the Court to set aside the termination determination.

19          There's actually not a request for the Court to

20  enjoin ICE from detaining or deporting the plaintiff in this

21  case.  So you can absolutely say whatever you need to say, but

22  I don't think that that issue that you're trying to brief up

23  orally at this moment is actually in front of me.

24          MR. KATZ:  No, and it shouldn't be.  I understand

25  that, your Honor.  I think that the reason it is in front of

1    you in a way is that the reason we're here today versus -- you

2    know, next week the Office of Immigration Litigation will be

3    coming to the case prepared to argue this whole thing.  We're

4    looking to get the full facts that -- we've talked about his

5    status to do that, but the reason I understand that we're here

6    today is largely the emergency is this fear of detention.  So

7    I thought --

8         THE COURT:  But there's no question that there is a

9    risk of detention in this case, right?  I mean, everybody

10   agrees there is a possibility that the plaintiff will be

11   picked up?

12        MR. KATZ:  Yeah.  I mean, I can talk to that, but

13   yes.

14        THE COURT:  But the government agrees, right, that

15   the plaintiff might be picked up given the SEVIS status?

16        MR. KATZ:  That ICE has the authority to do so,

17   correct.

18        THE COURT:  Right.  So I don't think that's in

19   dispute here.  I mean -- like I said, I'm going to give you an

20   opportunity to say anything you want, but I just want to make

21   sure that we're not walking down a road about the Court's

22   authority to do something that I'm not attempting to do and

23   the plaintiffs aren't asking me to do.

24        MR. KATZ:  Right.

25        What I'm saying, your Honor, is if -- the reason --

1  one of the main reasons that plaintiffs have given today to

2  have the TRO and get the relief they're seeking is to prevent

3  that detention.  That's the way I understood it.  That's the

4  major irreparable harm that they've argued.

5        And my point on detention and removal is that these

6  are all handled different ways through due process.  And I

7  thought it made sense to put that on the record and then I can

8  address the other irreparable harms as well, but that would

9  seem the main irreparable harm that was put forward.

10        THE COURT:  It's one of them, but I think -- I just

11  want to make clear that -- you started talking about the

12  Court's authority to enjoin ICE.  They're not asking the Court

13  to enjoin ICE.  They're talking about -- talking about

14  consequences of something is not the same thing as asking the

15  Court to enjoin that consequence.  They're asking the Court to

16  enjoin the government from this SEVIS status.  I just want to

17  make sure we're all on the same page.

18        MR. KATZ:  And we are, and I understand that, your

19  Honor.

20        THE COURT:  Okay.

21        MR. KATZ:  I think my point is to the extent there

22  is a focus on irreparable harm, it makes sense to understand

23  that process, how that notice of approval and detention

24  process works so that piece of it is met with due process, and

25  I'll move really quickly through this, but the bottom line is

1    that, you know, you get a notice to appear and you go before

2    an immigration judge, and only then after getting that upon

3    due process and a removal order can that happen, and then that

4    order is administrative appealable to the Board of Immigration

5    Appeals which then is appealable to the First Circuit.  So

6    there's a whole grounds for that.  And if he's detained, he

7    can file habeas corpus in district court.

8            And, you know, as you stated, it's not before the

9    Court, the decision is not before the Court, but just for the

10   record, the Court lacks jurisdiction to enjoin the issuance of

11   an NTA to do that, but I understand your Honor's point on

12   that.

13           So I just want to make clear for the record that

14   there is a way to deal with this process and these fears, and

15   there has not -- you know, we have not been told that there's

16   any evidence that he's been detained or in the process of

17   being detained from plaintiff or anything like that.

18           And as far as the other piece of irreparable harm,

19   which is his studies -- so my understanding is that he can

20   still -- plaintiff can still go forward with taking classes.

21   If he wanted to, he could take his credits and go to another

22   school outside the country.  He could do all of those things

23   and continue it.  So I don't see what the irreparable harm is

24   additionally.  Particularly if it's only going to be another

25   week or so before that's going to be argued.  So to me that's

1    what's really left is that irreparable harm because, you know,

2    any fear of detention is dealt with through a completely

3    different process which comes with due process.

4            THE COURT:  So your argument is that the fear of

5    detention is dealt with by the fact that he could then appeal

6    that detention.

7            MR. KATZ:  I mean, there is -- right.  There's a

8    whole handle to do that.  If that's what he's really trying --

9    I guess the point is if that's his main fear and he is trying

10   to get a TRO -- yes, I understand that it's not directly

11   seeking to stop this, but if that's the main fear that he has

12   as opposed to his studies, which I think is not irreparable

13   harm and could be dealt with in a week, then that is not

14   something that can be enjoined by the Court and is something

15   that is dealt through due process in a different way.

16           That's the government's position.

17           THE COURT:  I understand.

18           I'm not sure I'm buying the idea that just because

19   there's additional due process afforded after detention that

20   there's no fear of detention.  I mean, there are plenty of

21   TROs issued as a result of fear of arrest, and just because

22   you have a right to a trial after arrest doesn't mean that

23   there's no fear of arrest.  And you think of all of the TROs

24   that are issued that enjoin the application of potentially

25   unconstitutional laws, and a lot of that is based on the fear

1    of arrest and detention even though there would be a trial

2    eventually.

3              So I understand what you're saying.  I think I

4    understand the government's position on that.

5              Again, I don't think that that's exactly what's

6    before me, but I hear you -- I hear you saying that the

7    immediate need for Court action is dampened by the fact that

8    there would be some due process afforded if he were to be

9    detained.

10             Is that essentially -- is that the essence of your

11   argument?

12             MR. KATZ:  That's correct.  And I haven't heard,

13   you know, anything saying that, hey, I think I'm about to be

14   detained or someone is following me or any sort of argument to

15   that nature yet that he is in imminent danger of that.

16             Again, like I said, I don't have all the facts on

17   his status or anything like that this week, but based on what

18   I've been told from plaintiffs I don't understand that and I

19   understand he has not been yet detained.  And if he were to be

20   detained, your Honor, there is this whole process that gives

21   him all these rights if that were to happen.

22             THE COURT:  Well, I guess what I'll ask you this

23   then.  I mean, there are other students whose SEVIS status has

24   been altered, right?  I mean, this has happened before.  I

25   mean, I know it's unprecedented in some ways, but there are

1  other students whose SEVIS status has been altered in the past

2  few weeks.  Have some of those students been detained?  No one

3  knows yet?

4        MR. KIM:  If I may, your Honor.

5        So, yes, including some of the high profile cases

6  because their student status had been revoked.  I'm sorry.

7  Their visa was revoked and then terminated so they are in

8  detention.

9        Now, I don't have the information whether any

10 student whose status was terminated on or about, like, last

11 Friday has been detained or not.  That I don't have the

12 information yet.

13       THE COURT:  Okay.

14       MR. KIM:  But as far as all students similar whose

15 status has been terminated within this month, last month, yes,

16 there are plenty of examples of students either deported or

17 detained.

18       THE COURT:  Okay.  I also just want to clarify --

19 we're talking about -- a TRO is always very short.  It's a

20 maximum of 14 days.  I think in this case we're talking about

21 even shorter because -- the length of the TRO in this case

22 would be determined by the government's ability to respond.

23 You know, originally we were talking about a Monday response

24 from the government.  Now I'm hearing that maybe the

25 government needs a little bit more time.

1          You know, if the government had been prepared to

2    respond today, we maybe wouldn't be talking about a TRO.

3    Maybe we would be talking about a fully briefed up preliminary

4    injunction with an opportunity for the government to give me

5    the full factual and legal arguments, but the government is

6    not ready for that and so, you know, I'm put in a little bit

7    of a difficult position here trying to figure out how

8    I'm supposed to -- I'm evaluating this under the standard

9    that's required for a temporary restraining order with only

10   the facts available to me.

11         And so, you know, the government is saying the

12   plaintiff hasn't come forward with any real evidence that the

13   plaintiff is likely to be detained, but the change in

14   status -- the government is not contesting that there's been a

15   change in status, correct?

16         MR. KATZ:  We're not contesting that, but I don't

17   have the facts to explain why that change of status happened

18   at this point.

19         THE COURT:  Right.  Okay.

20         Okay.  Anything further on just the detention

21   issue?

22         MR. KIM:  Yes, your Honor.

23         THE COURT:  Hold on.  I'm trying to give the --

24   anything further from the government on the detention issue?

25         And then I will give the plaintiff an opportunity.

1          MR. KATZ:  No, your Honor.

2          THE COURT:  Okay.

3          MR. KIM:  If I may, your Honor.

4          I think that -- what my brother just explained was

5    I think first time that we confirmed his status actually has

6    changed because until now even though there was evidence of

7    the change of his status which forced Dartmouth College to

8    force him out of the research and treated him like out of

9    status, but, again, because we didn't have the screenshot or

10   we didn't have any notice from the defendants, we didn't get

11   the official confirmation.  But I think with the government's,

12   my brother's representation -- unless there was

13   misunderstanding, I think it's clear that the student status

14   has been altered and changed, and that's -- that creates this

15   fear and imminent threat.

16         THE COURT:  Let me just make sure we weren't

17   misunderstanding.

18         Attorney Katz, were we understanding correctly that

19   you're confirming that his status has changed?

20         MR. KATZ:  The information that I have is based on

21   what the plaintiff has said.  I don't have any further

22   confirmation from ICE yet.  We're working on all of that right

23   now.

24         THE COURT:  But do you have confirmation at least

25   that the SEVIS status is as represented in the Dartmouth

1   e-mail?

2           MR. KATZ:  I just have what the plaintiff gave me.

3   I'm taking from what the plaintiff has said that it's changed,

4   but I am still determining with ICE everything that has

5   happened, and I have not confirmed -- I don't understand that

6   I've confirmed anything yet.

7           THE COURT:  So in your three days -- not your

8   personally, but in your office's three days of conversations

9   with national counsel, you have not been able to confirm

10  whether or not the SEVIS status has actually changed?

11          MR. KATZ:  No.  I believe it's correct it has

12  changed.

13          THE COURT:  Okay.

14          MR. KATZ:  I believe that is correct, your Honor,

15  but I'm just waiting for a full report on this.

16          I think in my preliminary I can make the assertion

17  that I understand it has changed.  I don't know why it has

18  changed.  And if I find out later that it was an error for

19  some reason it happened, that's why I am hesitant to say that

20  I know the whole status because of that, but I do believe that

21  I've seen at least preliminary talks that it has changed.

22  But, again, I don't know what that means yet, and I don't

23  know, you know, the full extent yet of that.

24          THE COURT:  And let's -- I just want to afford

25  Attorney Katz the opportunity if -- he's been hamstrung a

1    little bit by coming into this case just today and trying to

2    understand what the status is of everything.  So I don't want

3    to trap him into a representation just because he hasn't been

4    able to get information from his client.  That's why I didn't

5    want to let you go too far on that.

6              MR. KIM:  I understand, your Honor.  I didn't mean

7    to put Attorney Katz into a difficult position.  It's just

8    because that fact, that information is critical for the

9    purpose of TRO, I thought that it was important to emphasize

10   it on the record.

11             So, again, the reason why detention is a heavy

12   factor in favor of the TRO is there is big difference between

13   student out of status, F-1 status has been terminated properly

14   pursuant to the regulation, and then the defendant, arresting,

15   detaining, placed in proceedings versus the person even with a

16   revocation of visa maintaining F-1 student status and then

17   going, still going after the student who otherwise has the

18   student status.  There's a big difference between that because

19   that question can be heavily contested during the detention

20   hearing or otherwise in deportation proceedings.

21             Now, even though we are not contesting that issue,

22   this Court's ability to intervene in this case and the outcome

23   of the TRO significantly changes the dynamics, which is why

24   the possibility of detention -- and we really hoped that we

25   could achieve this without litigating TRO by getting an

1   agreement, just short period of assurance that government

2   would not go after the plaintiff for that period, but even

3   then we could not get that assurance.

4           So, again, in the beginning we hoped that we would

5   give enough time to defendant to brief on that by Friday or

6   Monday and respond, but because of the lack of assurance it

7   forced us to request the Court to have an immediate hearing in

8   this case.

9           So that's the argument, a summary of the argument

10  that we have in terms of the detention.  Possibility of

11  detention constitutes the irreparable harm.

12          THE COURT:  Understood.  I just want to clarify

13  because we've been around and around on this.  I'm going to

14  understand for the purposes of this that the government is not

15  contesting that the status has changed in SEVIS at this point.

16  If you want to contest that at some later point, you can, but

17  for the purposes of this hearing the government is not

18  contesting that that status has changed in SEVIS?

19          MR. KATZ:  That's correct.  For the purposes of

20  this hearing, we're not.  If I learn something in the future

21  --

22          THE COURT:  Exactly.

23          MR. KATZ:  -- like I said or if it was changed by

24  an error and it has changed back or something like that, I

25  don't know that at this time.

1          THE COURT:  Understood.  Understood.

2          Everybody understands that?

3          MR. KIM:  Yes, your Honor.

4          THE COURT:  Okay.  Was there anything the

5    government wanted to say about the due process argument,

6    likelihood of success on the merits or the due process

7    argument?

8          MR. KATZ:  I think the one thing that I left out,

9    besides going through the detention due process piece, was to

10   the extent this is hinged on the revocation of his visa, which

11   I understand was one of the possibilities here or belief

12   that's what it was, this Court lacks jurisdiction to any

13   challenge of the State Department's decision to revoke his

14   visa under 8 USC 1201(i), and that would be part of the

15   removal proceeding.  That's where that will be determined.  So

16   I think it's just important for the Court.

17         THE COURT:  Do you guys have a -- do the attorneys

18   have a response to that particular argument?

19         MR. KIM:  Yes, your Honor.

20         Number one, we are not challenging the revocation

21   of visa.  We are only challenging the termination of F-1

22   student status.  The reason why that's important is the

23   notation says the visa was revoked and then SEVIS record was

24   terminated, but from plaintiff's perspective on the due

25   process principle, the plaintiff needs to know what's the

1  relation between revocation of the visa and termination of F-1

2  student status.  Because even though they might interplay a

3  little bit, under the regulation it's very specific when an

4  F-1 student is out of status and when defendants can terminate

5  the status.

6          So even though we are not challenging revocation of

7  visa, that notation of illogical relationship from our

8  perspective between revocation of visa and termination of F-1

9  student status, and there's no explanation as to why.

10         THE COURT:  So I just want to rephrase this for

11  myself so you can tell me if I got your argument wrong.

12         So your argument is that there is a due process, a

13  right to notice and an opportunity to be heard, in case the

14  visa wasn't revoked.  If it turned out it was revoked, then

15  those protections are over because there's no due process

16  protection.  There's no right to a hearing to challenge the

17  revocation itself, but there's a right for notice and an

18  opportunity to be heard about the change in status.

19         MR. KIM:  Correct.

20         THE COURT:  So if a change in status is a result of

21  being identified in a criminal records check rather than a

22  revocation of a visa, then this issue doesn't come up, right?

23  Then the prohibition in 8 U.S.C. 1201 probably doesn't come

24  up.

25         MR. KIM:  Right.  But we don't even know that.  We

1   don't even know whether the F-1 student status was terminated

2   because of the criminal act issue, which doesn't go into the

3   Court's jurisdiction or issue, whether this is related to the

4   visa revocation, which can go to this Court's jurisdiction

5   issue, but we don't even know that.  We don't even have the

6   explanation from that notation from the SEVIS record which one

7   is the basis for the termination of --

8           THE COURT:  So if your plaintiff got notification

9   that his visa was revoked before the SEVIS change in status,

10  there would be -- would there be no due process right to the

11  SEVIS revocation because he would already know that -- how

12  does this all work together?

13          MR. KIM:  There is.  There still is because again

14  the State Department has the power to revoke the visa.

15          THE COURT:  Okay.

16          MR. KIM:  And Department of Homeland Security, the

17  defendants, have the power to terminate the status.

18          So let's assume for the hypothetical scenario that

19  plaintiff didn't receive revocation of the visa.  That does

20  not automatically constitute termination of F-1 student

21  status.

22          So still even if he -- assuming that he did receive

23  such notice from the State Department, for example getting a

24  call from the U.S. Embassy in China or the State Department in

25  D.C., he still is entitled to receive the notice with respect

1  to the termination of the student status as well as a

2  meaningful opportunity to be heard because the basis to

3  terminate revocation of the visa and terminate status, they

4  are very different.

5          Why the State Department --

6          THE COURT:  I mean, are they different?  I mean, if

7  the visa is terminated, they can terminate status, right?

8          MR. KIM:  No.

9          THE COURT:  I mean, they can change the status in

10  SEVIS.

11          MR. KIM:  No.

12          THE COURT:  No, because of this entry and reentry

13  issue?

14          MR. KIM:  Correct.

15          THE COURT:  Okay.

16          MR. KIM:  So even if the visa was revoked, assuming

17  that that's actually true, that doesn't mean that his SEVIS

18  record should have been terminated.

19          THE COURT:  Right.  Unless he leaves the country,

20  and then --

21          MR. KIM:  Yes.  Correct.  If he leaves the country,

22  he would not be able to come back unless he reapplies for the

23  visa at the embassy overseas and gets a visa, but that's a

24  very different scenario because, again, while he's in the

25  United Stated the mere revocation of visa does not

1    automatically terminate his student status.  There's no

2    regulation.  There's no statute allowing such termination of

3    F-1 student status.

4                    THE COURT:  Okay.

5                    MR. KIM:  I don't have further with respect to due

6    process argument, but I can go into the APA claim.

7                    THE COURT:  Okay.

8                    Attorney Katz, do you want to be heard on any of

9    the conversation we just had about the due process rights with

10   respect to SEVIS as differentiated from the due process rights

11   related to the revocation of the visa?

12                   MR. KATZ:  I mean --

13                   THE COURT:  And, again, it's okay if you don't.  I

14   mean, I understand that the government is not prepared to

15   provide substantive responses to these legal and factual

16   arguments.

17                   MR. KATZ:  Yeah, and I think that's something that

18   the government would want to respond to with the Office of

19   Immigration Litigation that, you know, the nuance that he's

20   talking about there, the differences.

21                   I will say the way we initially understood this was

22   that there was an understanding or an assertion by plaintiff

23   that he thought his visa had been revoked and that this was I

24   guess an indirect way to challenge it, and that's why I raised

25   the jurisdiction issue just for the record in terms of the

1    nuance, the differences, and what happens when a visa is

2    revoked versus the SEVIS record status, student status.  I

3    reserve that for a later day on the substance if it's to be

4    heard on that.

5              THE COURT:  Understood.

6              MR. KATZ:  And, yeah, that's all I have on that

7    issue.

8              THE COURT:  Okay.  I just want to check with the

9    court reporter.

10             Do you need a brief break?  You're okay?  Okay.

11             Do you guys want to move on to the Administrative

12   Procedure Act?

13             MR. KIM:  Yes, your Honor.

14             So independent from due process argument, under APA

15   the government cannot act outside of the legal authority.  So

16   the legal authority comes from statute or regulation.  And as

17   the Third Circuit in Jie Fang indicated, the authority of the

18   government to terminate F-1 student status is limited by the

19   regulation, and it's very specific in terms of three

20   categories where the defendants can unilaterally terminate the

21   status.

22             None has happened here.  At a minimum, that's the

23   plaintiff's allegation, and of course that's something that if

24   the defendants want to rebut and respond, they can do that,

25   but at least for now none of those criteria has happened or

1   otherwise he has maintained his status.

2          Again, the updated SEVIS record indicates --

3   deleted that otherwise failure to maintain student status,

4   deletes that portion.  So I'm assuming that defendants are not

5   alleging that plaintiff has failed to maintain his status.

6          Then if that's not the case and if, for example,

7   then -- unless it's a criminal issue, unless it is consistent

8   with a regulation, we just do not know under which legal

9   authority that defendant actually could unilaterally terminate

10  his F-1 student status.

11         And that's the information as of now, and our

12  allegation is that defendants have no legal authority either

13  by the statute or regulation to terminate plaintiff's F-1

14  student status, and, therefore, under APA that's unlawful and

15  that decision to terminate should be set aside.

16         THE COURT:  Okay.  Thank you.

17         MR. KATZ:  Your Honor, I don't have a response at

18  this time.  Also, considering it's intertwined with some facts

19  that I would need and that I assume the Office of Immigration

20  Litigation will need when they respond.

21         THE COURT:  Okay.

22         So just for clarification, the only facts I have in

23  front of me are the verified facts of the plaintiff that none

24  of the developments necessary to justify the right to

25  terminate under the APA have occurred in this case.  I mean,

1     that's the state of the record right now.

2           MR. KATZ:  Yeah.  I mean, I understand.  I don't

3     have an answer to that at this time.

4           THE COURT:  Okay.

5           All right.  We have talked about possibility of

6     irreparable harm.  We talked about likelihood of success on

7     the merits.  Obviously, I'm wrapping irreparable harm under

8     the four-factor test in with the need for the TRO unless you

9     want to be heard separately.

10          MR. KIM:  No, your Honor.  Yes, it's all

11    interrelated.  There's a third prong and a fourth prong, the

12    public interest.

13          THE COURT:  We're going to get to those.  I do want

14    to cover the balance of the relevant hardships because I've

15    heard from you, and I understand that the government -- you

16    know, I'm trying to give you an opportunity but not force you

17    to respond if you're not ready, but I want to make sure we

18    give the government an opportunity to respond to the portions

19    that they're ready to respond to.

20          So I do have your arguments on these.  I want to

21    hear from you if you want to make those arguments, but why

22    don't we flip this and I'll just start with the government and

23    let the government tell me if they have anything they want to

24    say on these.

25          Do you have anything that you want to add on the

1    balance of the relevant hardships?

2              MR. KATZ:  Your Honor, I don't think too much

3    different than our argument on the irreparable harm, which is

4    that with detention worries there haven't really been anything

5    asserted as to events about to happen or not, and, two, that

6    that's held by a separate due process.

7              And as far as the irreparable harm as to his

8    student status, I don't know that another week would make a

9    difference.  And also given the fact that he still can take

10   classes, he still can get his credit, and he can continue his

11   Ph.D., it's not that he's left without a way to finish his

12   Ph.D. program particularly in, you know, in just the immediate

13   future.

14             So I think if you look at the balance of the

15   hardships from exploring this even another week or two, I

16   don't see that the balance tips in the favor to grant the TRO

17   here given the lack of hardship that's been asserted.

18             THE COURT:  Well, I mean, I guess I'll put it

19   another way.  It's a balance.  So what is the government's

20   hardship?  What we're talking about here is a TRO that's

21   between now -- the TRO requested is between now and when the

22   government is prepared to respond to the allegations in both

23   the request for preliminary relief -- and my understanding, by

24   the way, in the more recent filing is that there might be a

25   more robust preliminary injunction motion.  I wasn't sure --

1    we'll get to that at the end of this hearing.  But when the

2    government is ready to respond between now and then, so some

3    period 14 days or less, to a requested TRO that would enjoin

4    the government from terminating the F-1 student status under

5    the SEVIS system and require the government to set aside their

6    termination determination in SEVIS.  So what's the hardship

7    that would be suffered by the government if I were to issue

8    that TRO?

9            MR. KATZ:  Again, your Honor, without any more

10   facts, I don't know that I can fully answer that other than to

11   kind of go back to just the point as to the extent this is

12   indirectly trying to enjoin detention.  Again, not that I have

13   the facts on that.  That -- you know, that's not something

14   that's appropriate that I can do.

15           But as far as your question about SEVIS itself, I

16   don't have an answer apart from, you know, the irreparable

17   harm piece of this and the fact that I don't see the balance

18   of hardships -- you know, how the balance equity tips the

19   other way really and what the hardship is for another week of

20   not having a TRO hearing.

21           THE COURT:  Well, I mean, he's not getting paid.

22   He's not moving towards his Ph.D.  He might be forced to --

23   he's going to be forced to register for classes that don't

24   have this research component that might preclude him from

25   continuing even if I were to ultimately grant the relief.

1  This is not my argument, obviously.  I'm reiterating the
2  argument received from the plaintiffs that even if I were to
3  ultimately grant the relief requested at the later hearing, it
4  may be too late to rejoin those research classes which would
5  extend the Ph.D. program an entire semester which is both
6  time-consuming and expensive.  So, I mean, I think that's the
7  hardship that's been put in front of me that has nothing to do
8  with a risk of detention or deportation.

9           So I do have something in a basket for the
10 plaintiff, and that's why I was asking, you know, what is in
11 the basket for the government.

12          It's okay.  You know, I understand, I think, what
13 your argument is on behalf of the government, which is really
14 that perhaps this is an end run to interfere with the
15 government's ability to detain or deport, but I think given
16 how closely cabined the request is for the temporary
17 restraining order in this case -- you know, I'm not being
18 asked to interfere with the government's ability to detain or
19 deport.  I'm being asked this very narrow thing which really
20 is related to his ability to participate in his educational
21 endeavors.

22          MR. KATZ:  I understand, your Honor, and I don't
23 have really anything to add on what I know now as to what the
24 specific harm to the government is on the SEVIS apart from how
25 you articulated it before.

1          THE COURT:  Okay.  Anything the plaintiff wants to

2    add to that particular prong?

3          MR. KIM:  Briefly, your Honor, if I may.

4          So because of the defendant's university letter of

5    termination of F-1 student status the plaintiff is the one who

6    is suffering, like, every minute, every second, and we don't

7    have much time whether he can even go back to the research

8    credit because the most recent evidence we submitted was the

9    school -- because school had concern with compliance with its

10   own regulation, school is forcing plaintiff to enroll in

11   non-research classes which would not be meaningful for his

12   Ph.D. program.

13         So by the time of two weeks even if this Court

14   grants, for example, preliminary injunction, even assuming

15   that happens, there is a very good chance that he would not be

16   able to go back to the research credit because of how the

17   school registration system functions.

18         And he's not getting any money.  He is sitting in

19   fear in his residence not being able to do anything.  The only

20   thing that he has done at least based on our allegation is

21   studying hard.  That is it.

22         He has been in the United States since 2016.  The

23   only thing that he has done, not even driving, not even doing

24   a lot of social, but he wanted to be a scholar in computer

25   science and he knew that the United States was the most

1   competitive in the country in terms of computer science in the

2   world.  So that's the only thing he has done is study very

3   hard, and now because of university letter of termination,

4   he's the one who is suffering.

5             So we hope that the Court issues TRO, and I

6   understand it's not going to be very long because we will

7   quickly move into filing the preliminary injunction memorandum

8   so that we can litigate the legal issues and the others

9   through the PI proceedings, but we hope the Court issues the

10  TRO as soon as possible.

11            THE COURT:  Okay.  Thank you.

12            MR. KIM:  Thank you.

13            THE COURT:  There is one final prong.  It was a

14  precise closing, but there is one more prong, which is the

15  affect of the Court's rule on the public interest.

16            We'll start again with the government.  If you

17  would like to add anything on the public interest here,

18  Attorney Katz, I'm going give you an opportunity to do that.

19            MR. KATZ:  I don't think it's much more than I've

20  already stated, but, again, in terms of ICE being able to

21  implant its enforcement authority, that is in the public

22  interest.  And to the extent that this is an attempt to

23  implant that somehow, that is in the public authority and

24  otherwise ICE or the State Department to carry out the various

25  tasks that need to be carried out.  So that's obviously -- I

1   think that's already been stated in some way for the record,

2   but that is in the public interest.

3          THE COURT:  Okay.  Yeah, I can assure you I have

4   that in mind.  I've been trying to express that I have that in

5   mind throughout.

6          MR. KATZ:  And you have, your Honor, and,

7   therefore, I don't want to dwell there too much other than to

8   make that point for the record.

9          THE COURT:  Okay.  I appreciate that.

10          MR. KIM:  If I may briefly, your Honor.

11          So the public interest lies with what Congress has

12   intended really.  Because Congress intended to allow

13   non-citizen students to come into the country as long as they

14   comply with the regulations and they study as they intended,

15   and that's precisely what plaintiff has done.  So the

16   defendant university letter of termination of his F-1 student

17   status is forcing the school and forcing him to be not doing

18   the things that he should have done consistent with what

19   Congress intended.  So the public interest prong should be

20   heavily in favor of plaintiff.

21          THE COURT:  Okay.  Thank you.

22          Does the government take a position on whether a

23   bond should be required in this case if the Court were

24   inclined to grant a temporary restraining order?

25          MR. KATZ:  Yes, your Honor.

1          The government does request an order in accordance
2   with Rule 65.
3          THE COURT:  Okay.  Does the government have an
4   amount of a bond that it would request?
5          MR. KATZ:  Your Honor, we're unaware again of what
6   the actual costs that will be incurred are yet.  So we just
7   ask that a reasonable bond be given.
8          THE COURT:  It's very typical in these types of
9   cases.  You're just requesting one and no specific amount?
10         MR. KATZ:  That's correct, your Honor.
11         THE COURT:  Okay.
12         Plaintiffs, do you want to be heard on the issue of
13  bond?
14         MR. KIM:  We ask the Court to waive the bond in a
15  case like this.
16         THE COURT:  Okay.  I'm probably going to take a
17  brief recess of about five minutes.
18         Is there anything else that either party would like
19  to say before I do that?
20         MR. KIM:  No, your Honor.
21         MR. KATZ:  No, your Honor.
22         THE COURT:  Okay.  I can't promise you that I'm
23  going to give you a ruling when I come back out here.
24         Okay.  A brief recess.
25         (RECESS)

1          THE COURT:  Okay.  Now that you've had the benefit

2     of a few minutes, I know when I was in your position sometimes

3     I thought of a few things I wish I had said, does anybody else

4     want to add anything to the record?  It's okay if you don't.

5     Sometimes it's better not to.

6          MR. KIM:  No, your Honor.

7          THE COURT:  Anything from the government?

8          MR. KATZ:  No, your Honor.

9          THE COURT:  Okay.  Well, ably argued.

10         I'm going to tell you what I'm going to do.  I'm

11    not going to issue my official ruling from the bench right

12    now, but I'm going to tell you that I'm going to grant the

13    temporary restraining order.

14         You'll get a brief order that follows mostly the

15    proposed order that you filed.  The relief requested will be

16    identical to the relief that you requested in your proposed

17    order, but the reasoning might just be a little bit different

18    because I had to combine some of the supplements that you

19    filed.  I'll try to get that out quickly.  I have a 2 o'clock

20    so it might be after that, but I'll try to get it out sometime

21    today.

22         Is there any follow-up now?  I don't know if you

23    guys are going to communicate and let me know when we're going

24    to schedule the next hearing in this case.

25         MR. KIM:  Yes, your Honor.  The plaintiff plans to

1    discuss the preliminary injunction, the scheduling, so that

2    the Court does not need to set the schedule so that the

3    parties can propose the scheduling.

4            THE COURT:  Okay.  I have some potentially

5    inconvenient news for you, but we only have 14 days so that

6    gets us to the 23rd, which is fine, but I am out and

7    unavailable the final week in April, which probably doesn't

8    come as a surprise to many of you, so it needs to be before

9    then with time for me probably to issue an order.

10           So to the extent that the government wants the full

11   14 days, let's try to give it less than the full 14 days so

12   that I can have an opportunity to issue a robust order and

13   really give this the time and thought that's necessary for

14   such serious issues.

15           MR. KIM:  Yes, your Honor.  Plaintiff will confer

16   with the defendant's counsel.

17           THE COURT:  Okay.  Anything else?

18           Oh, and I was willing on such short notice this

19   morning to accommodate counsel from I believe it was

20   Washington D.C. via Zoom, but typically I require parties to

21   be present in court for oral argument.  So we should plan on

22   people being here in person if they're planning on

23   participating in the hearing.

24           MR. KATZ:  Understood, your Honor.

25           THE COURT:  Okay.  If there are extenuating

1   circumstances, obviously, please bring them to my attention.

2   I do try to be -- you know, I try to be accommodating to the

3   extent that I can, but I do find it's a better conversation

4   and more meaningful if we can have everybody in the same room.

5           MR. KATZ:  Understood, your Honor.  That request

6   was just in the hope of having all the lawyers here today.

7           THE COURT:  Yeah, which is why I granted it.  Yes.

8   Absolutely.

9           MR. KATZ:  If it's next week, with the

10  understanding that they would have to be here in person.

11          THE COURT:  Okay.  All right.

12          Nothing further?

13          Okay.  Court's adjourned.

14          (Conclusion of hearing at 12:30 p.m.

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5   foregoing transcript is a true and accurate transcription of

6   the within proceedings to the best of my knowledge, skill,

7   ability and belief.

8

9

10  Submitted:   4-23-25      /s/   Susan M. Bateman _____
                            SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25