*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 24, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * * *
                                      *
XIAOTIAN LIU,                         *
                                      *
              Plaintiff,              *
                                      *  1:25-cv-133-SE-TSM
          v.                          *  April 22, 2025
                                      *  1:31 p.m.
KRISTI NOEM, SECRETARY OF THE         *
DEPARTMENT OF HOMELAND SECURITY;      *
TODD LYONS, ACTING DIRECTOR OF THE    *
IMMIGRATION AND CUSTOMS               *
ENFORCEMENT,                          *
                                      *
              Defendants.             *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE SAMANTHA D. ELLIOTT

Appearances:

| | |
|---|---|
| For the Plaintiff: | SangYeob Kim, Esq. |
| | Gilles R. Bissonnette, Esq. |
| | American Civil Liberties Union of NH |
| | |
| | Ronald L. Abramson, Esq. |
| | Shaheen & Gordon PA |
| | |
| For the Defendants: | Glenn Matthew Girdharry, Esq. |
| | U.S. DOJ Civil Division |
| | Office of Immigration Litigation |
| | |
| | Raphael Katz, AUSA |
| | United States Attorney's Office |
| | |
| Court Reporter: | Liza W. Dubois, RMR, CRR |
| | Official Court Reporter |
| | U.S. District Court |
| | 55 Pleasant Street |
| | Concord, New Hampshire 03301 |
| | (603) 225-1442 |

P R O C E E D I N G S

THE CLERK:  Court is in session and has for consideration a motion hearing on the motion for preliminary injunction in Xiaotian Liu vs. Kristi Noem, civil case number 25-cv-133-SE.

Could I have counsel identify themselves for the record, beginning with counsel for the plaintiffs please.

MR. KIM:  Good afternoon, your Honor.  SangYeob Kim for plaintiff.

MR. BISSONNETTE:  Good afternoon, your Honor. Gilles Bissonnette for the plaintiff.

MR. ABRAMSON:  Good afternoon.  Ron Abramson, Ronald Abramson, on behalf of the plaintiff.

MR. GIRDHARRY:  May it please the Court.  Good afternoon, your Honor.  Glenn Girdharry, Department of Justice for the United States.  At counsel's table with me is Assistant United States Attorney Raphael Katz.

THE COURT:  Good afternoon, everybody.  If you'll just bear with me for one moment.

Okay.  So, as the clerk said, we are here today for a hearing on the plaintiff's motion for a preliminary -- preliminary injunction.  I have reviewed everything carefully, both the motion, the opposition, there was -- there were a number of supplementations.  I'm including the correction that we received today from the defendants.  Thank you for that.

What I'd like to do, which will come as no surprise to the attorneys who have appeared before me in the past, is I have a couple of questions I'd like to start off with.

I will give everybody an opportunity to say whatever they need to say. I'm going to let you create the record that you need to create. But I just want to make sure that I get the information that I need as a basis to move forward here even during this hearing because I did read everything, but there are a couple things hanging out there that I'm not really sure about.

And the beginning of that really starts with I have some questions, really, for the defendants. So I'm going to start with those, if you'll indulge me.

So the first question I have for the defendants is -- is it Mr. Liu? Am I pronouncing that correctly?

Mr. LUI: (Nods head.)

THE COURT: Mr. Liu? Okay. You should correct me if I'm saying it --

MR. KIM: That's correct --

THE COURT: Okay.

MR. KIM: -- Mr. Liu. Correct, your Honor.

THE COURT: Okay. So for the defendants, what is Mr. Liu's current F-1 student status?

MR. GIRDHARRY: Thank you, your Honor. Is it all right if I address the Court from the table right here?

THE COURT: Absolutely. And you can stand or sit. I don't have a preference one way or the other.

MR. GIRDHARRY: Okay. And to answer the Court's question, at the declaration from Mr. Watson that the government provided and attached to its -- its opposition brief, Mr. Liu's nonimmigrant status has not been terminated.

THE COURT: Well, so I have a -- see, this is the problem that I have.

So it does say in your papers that he is still in F-1 nonimmigrant status, but then you cite to the Watson declaration at paragraph 11, but that's not what the Watson declaration at paragraph 11 says. That only says that SEVP has never claimed that it had terminated Liu's nonimmigrant status. So I wasn't really sure how to read that.

I understand the government's never made an assertion that it terminated his nonimmigrant status, but that's not the same thing as an affirmative statement to the Court that he is currently -- he currently has an F-1 student nonimmigrant status.

MR. GIRDHARRY: Understood, your Honor, and number -- number 7, paragraph number 7 in the Watson declaration, indicates that Mr. Liu -- it affirms or it -- it confirms that Mr. Liu was admitted as an F-1 nonimmigrant visa holder. So that's the status we're talking about, based on the declarations.

So for Mr. -- for the ICE declaration to indicate that they have never terminated his status, that's the status that they're talking about.

THE COURT:  Well, I mean, my understanding is there are two issues here.  There's the visa, and then there's the F-1 student status.  There's two separate things.  So I'm asking you specifically about his F-1 student status.

So absent -- right now, what is the -- what is his F-1 student status?

MR. GIRDHARRY:  And you're absolutely right.  These are -- we're talking about several different things because this case presents a lot of things that have been conflated.

And the answer -- the answer to your question is Mr. Liu -- based on the declaration that ICE has provided and the representations that the agencies have made to me, Mr. Liu is still in his current nonimmigrant status.  What has occurred is registration in the SEVIS, in the SEVIS database as it pertains to him, has been terminated.  So that's separate from the status that he's holding and that's separate from the visa that was issued to him by the State Department.

THE COURT:  And we're going to get to that.  We're going to get to whether or not those two things are separate.

And so I guess that begs the question then, you know, if he is currently still in F-1 nonimmigrant status and still able to exercise all the rights and privileges that

attend that status -- and that's what you're telling me, right?

MR. GIRDHARRY:  Not as it pertains to the SEVIS database, whatever comes from the SEVIS database.  So the SEVIS database record in there has been terminated.  And, again, an F-1 student is a little different than another nonimmigrant status in the sense of -- and the thing that jumps out the most is for how long are they in that status when they're admitted to the United States.

An example is another nonimmigrant status would be admitted to the United States with an end date, saying that this is the date in which your status is over, you need to seek an extension or a change of status by or before that date, and -- or depart the United States.  And so there's a -- a date certain in which that's -- that status ends.

For a student, an F-1 student, they're admitted for a duration -- for a period known as duration of status, or DS, and with that comes -- it becomes a little hypertechnical in the sense that -- and I think we've explained this.  It -- it indicates that the end of that status requires a determination by an administrative agency, either USCIS, U.S. Citizenship and Immigration Services, or an immigration judge, when a person -- when an IJ would have jurisdiction over --

THE COURT:  You're talking about visa.  So I want you to answer my question, though.

MR. GIRDHARRY:  Well --

THE COURT:  My question is very specific.

So you agree with me that there are certain rights and privileges that come with this -- and you're saying SEVIS status.

We had some conversation at the TRO hearing about SEVIS versus SEVIS and I'm going to defer to you because you've been at this game a lot longer than I have.  So I'll go with SEVIS.

There are certain rights and privileges that come with this SEVIS status itself.

MR. GIRDHARRY:  If I could correct your Honor.  There's not a status connected to SEVIS.

THE COURT:  Okay.

MR. GIRDHARRY:  SEVIS is a database.

THE COURT:  Okay.

MR. GIRDHARRY:  And there's an entry in the database as it relates to persons.  And that -- that is information that is collected by the Department of Homeland Security under its authority, 8 U.S.C. 1372.  It does not provide status to anybody.

THE COURT:  Okay.

MR. GIRDHARRY:  It's a database that collects information.  The -- the status is provided through different -- different things.  From the -- from the outside of the United States, a person would get the visa from the State

Department, use that visa to travel to the United States.  In order to get that visa, they would have to get permission to -- to get the visa, which, in this case, a student would have to get a document from the school, an I-20 --

THE COURT:  Yup.

MR. GIRDHARRY:  -- and then that allows them to apply for the visa, they get the visa, they come to the United States through the port of entry, then they're admitted. They apply for admission and with the visa, with the I-20, they are admitted -- they apply for admission and then U.S. Customs and Border Protection would admit them into the country in a status.

THE COURT:  And you -- okay.  So we all agree that Mr. Lui did all of those things.

MR. GIRDHARRY:  I mean, based on the facts before us, I believe that's correct.  Otherwise, he -- that's how he was in F-1 status.

THE COURT:  Okay.  So he was in F-1 status.  His -- we'll -- I'll borrow your language.

Is he currently in F-1 status?

MR. GIRDHARRY:  This SEVIS record has been terminated and he is holding the nonimmigrant status in which he was admitted to the country, which is F-1.

THE COURT:  These not my question.

Using your lingo, he was in F-1 status.  Is he

currently in F-1 status?

MR. GIRDHARRY:  He's holding F-1 nonimmigrant status.  Yes, your Honor.

THE COURT:  So he can -- he has all the rights and privileges that he previously had.

MR. GIRDHARRY:  As it relates to -- as it relates to the status which he currently holds.  The difference in this case, your Honor, is that his registration in SEVIS has been terminated.  So to the extent that there is something connected to the SEVIS database -- I mean, that is what's -- that is what has changed in this case.  That in itself does not cause a termination of status.  That does not cause revocation of the visa.  In this case before us right now, that's -- that's the situation.

THE COURT:  So what -- what could he do before that he can't do now, now that his -- now that there's been a termination in the database?

MR. GIRDHARRY:  If he -- if the -- if the school needed to update something related to his attendance at the school, his -- his record in SEVIS is not deleted, but it's terminated.  The school could not update the record.

For instance, if there was an instance in which the school had to make a determination -- indicate that he was no longer attending classes or something like that, or he had committed -- or he was -- was arrested or committed a criminal

-- was involved in some type of criminal activity, making -- and if the school, for instance, were to cancel or remove him from school for whatever violation of school policy and they had to report that in the database, that is something that they wouldn't be able to do.

THE COURT:  So the school couldn't comply with its responsibilities to the federal government with respect to having a foreign student attending its own -- its university.

MR. GIRDHARRY:  That's not -- that's not -- that is not a hundred percent accurate.  There are certain things that they could not do with respect to the -- the SEVIS database, but they would -- the regulations that govern that section, the school's obligation to -- to -- the reporting requirements, there is a part in that regulation that says that things are -- things that are reported in the normal course of attendance at the school would have to continue -- I mean would continue.  So whatever -- whatever is -- whatever is done as a reporting requirement, as an internal process at the school, that would continue.

THE COURT:  Okay.  So let's get back to my question that I've asked a couple of times now.

He had privileges attendant to his status as an F-1 student:  He could attend Dartmouth University as a Ph.D. student; he could participate in research; he could travel into the United States in order to do that.  There were -- there

were certain things he could do as a result of that status.

The government's papers have repeated that that status has not changed, only the record has changed.  Can he still do all of those things I just listed?

MR. GIRDHARRY:  He can, your Honor.

THE COURT:  Okay.

MR. GIRDHARRY:  Any determination that he cannot do those things is not a determination from ICE.  That's a determination from the school.

THE COURT:  So he could -- he could fly back to China and then return to the United States with a terminated SEVIS record?

MR. GIRDHARRY:  He would have to get a new I-20.

THE COURT:  So he can't --

MR. GIRDHARRY:  He can -- he can depart the country at any time.

THE COURT:  Could he return to the United States to study at Dartmouth with a terminated SEVIS record?

MR. GIRDHARRY:  He would have to request a new I-20. His visa -- the State Department has indicated to us, and this is not part of Mr. Liu's complaint, that his visa as not been revoked and he has not -- he is not making an allegation along those lines.  And the State Department's indicated to me that the visa is still valid, that travel is still valid.  He would have to -- part of that process requires an I-20 and he would

have to get a new I-20.

Now, I -- he could -- he could make the request for that.  There is nothing before the Court that says he's made that request and has been denied a new I-20.

THE COURT:  This isn't about whether he's -- once he -- whether he can -- I'm trying to get to the point -- I mean, the government's -- all of the government's papers depend on the idea that this is -- this is a record issue and not a substantive issue.  And so I'm trying to determine whether the challenge here -- and I -- and there are other ways to think about this, which is what is the plaintiff actually requesting, and we're going to talk about that in a little bit, but I'm trying to get to the point here of whether -- whether even the government needs to acknowledge that changing his SEVIS record is a substantive -- does affect substantively his rights and privileges within United States.  It's not just a record.  It's more than that.

So let me ask this a different way.  Does his SEVIS record accurately reflect his F-1 status?

MR. GIRDHARRY:  Currently, his SEVIS record, or prior to termination?

THE COURT:  Prior -- prior to this lawsuit.  So before -- prior to the temporary restraining order, did his SEVIS record accurately reflect his F-1 status?

MR. GIRDHARRY:  To the extent that the school

reported what it was supposed to report -- and just to be clear, your Honor, you're talking about when it was indicated to be active, when the record was indicated to be active?

THE COURT:  Well, the -- we -- we have a declaration submitted by the defendants that says that his SEVIS record was changed to terminated based on Mr. Liu's encounter with CPB. So when his SEVIS record was changed to terminated, did that accurately reflect his F-1 status in the United States?  Was that -- was his F-1 status terminated?

MR. GIRDHARRY:  It was not terminated, your Honor, and there we're -- we're crossing the line between the SEVIS database record and the status again.

And the -- the paragraph you're referencing, number 7 here, the Court's question was did the record -- did the SEVIS database accurately reflect Mr. Liu's F-1 status?

THE COURT:  I'm trying to get -- I mean, the government makes an argument -- all of the government's arguments in the opposition depend on the Court agreeing that this is simply a record issue and not a substantive issue.  And I'm just trying to understand -- I'm not sure that -- if I were to believe the government that this is simply a record issue, I'm not sure that the answer to my question matters, but I -- I'd still like an answer to my question, whether the -- the SEVIS record accurately reflected the plaintiff's F-1 status at which point; does it accurately reflect it now, did it

14

accurately reflect it prior to the issuance of temporary retraining order?

MR. GIRDHARRY:  The answer is yes, your Honor, before the restraining order, when there was an active record, it did accurately reflect to the extent that the school had entered information correctly and was accurately maintaining the information it was providing for the SEVIS record.

And so after it was -- when it was terminated, it was terminated upon Homeland Security's records check.  And, to be clear, the authority to do that, it comes from 8 -- it's a congressional mandate under 8 U.S.C. 1372, and it's in the government's brief.  Congress mandated that Homeland Security shall develop and conduct a program to collect information as it relates to -- and I'll just paraphrase it to F-1s because it includes M-1s, but to F-1 students.

And that authority over -- over that collection of information to develop and conduct, that's where the authority comes to maintain the database and to indicate active, inactive, completed, I believe, terminated.  Those are the different ways they can make notations in the database.

And upon Homeland Security's determination that a criminal records check -- it uses the term criminal records check.  That is generally what it is.  It's a records check on any derogatory information, and that can be anything.  Within that authority, Homeland Security terminated Mr. Liu's SEVIS

database record.  And as the Watson declaration makes -- indicates, it says that that action did not terminate his nonimmigrant status.

THE COURT:  So -- so it terminates his record, but his F-1 student status is still active and intact.

MR. GIRDHARRY:  That's a separate thing.  Yes, your Honor.

THE COURT:  Okay.  So he still has all the rights and privileges that he had prior to the termination of the SEVIS record?

MR. GIRDHARRY:  The rights and privileges -- I mean, I -- I agree with you but for anything that's related to the terminated SEVIS database.

THE COURT:  Right, but that's when I'm trying to get at.  What is related to the terminated SEVIS status?  That's what I'm trying to get you to tell me.  Once they terminate his SEVIS status -- his SEVIS database, what can he no longer do?

MR. GIRDHARRY:  It's just a records determination that there's -- there's -- based on the information before us, before -- the claims that -- that Mr. Liu's making, that he -- his status has been terminated.  That's incorrect.  That the school will not allow him to do whatever they're not letting him -- not allowing him to do, that is not a determination from ICE or from Homeland Security.  That is -- that is a determination by the school.  Mr. Liu provided email that

mentioned -- that indicated all of these things, that the school made this determination.  There's nothing in the record and there's nothing that says that ICE has made that determination or sent that determination to him.

THE COURT:  So the government is disputing that schools are prevented from allowing students, foreign students, to continue to participate in research, for instance, if they have -- if their records are -- are terminated in SEVIS.

MR. GIRDHARRY:  I mean, that's a pretty wide generalization without knowing the facts.

THE COURT:  It's a question.  I mean, so if Dartmouth were to allow the plaintiff to participate in research -- I'm going to make it as specific as possible.

In this case, if I were to agree with the government and deny the preliminary injunction in this case and Dartmouth were to move forward and allow the -- the plaintiff to participate in research, that's not something that the government would have any problem with because the termination of his SEVIS record is irrelevant to Dartmouth's decision to allow him or not allow him to participate in research.  Is that the position of the defendants in this case.

MR. GIRDHARRY:  I wouldn't use the term irrelevant. I think that's a decision that Dartmouth -- his school would have to make.  And if they proceeded to make that determination, that's within their -- their power to say yes or

17

no to him for him to do that.

THE COURT:  That's not my question.  My question for you is what is your defendant's -- your client's position on Dartmouth's authority to allow him to participate in research if his SEVIS record is terminated.

MR. GIRDHARRY:  Again, that's a -- that's a determination that the school would have to --

THE COURT:  That's not my question.  What do your -- your clients need to take a position.  He either -- if his SEVIS record is terminated, can he or can he not, from their position -- they're not going to tell -- it doesn't matter what Dartmouth thinks.  I want to know what they think.

Are they going to say that as far as we're concerned, he can do whatever he wants at Dartmouth because if I -- here's my wonder.

You guys want to enter into a stipulation that he can participate fully in his educational activities during the pendency of this litigation, I don't think we need this hearing.  You've looked at the relief that they're requesting.  You want to -- you want to enter into a stipulation on behalf of your clients that this plaintiff can remain here, can participate in his educational opportunities, pursue his Ph.D., and that this was just a -- it's just a record, it has nothing to do with that, then we're done.

Is that -- is that the position?  Because we can

take a recess.

MR. GIRDHARRY:  I mean, that would be -- that would be -- I understand what the Court's saying.  I don't think that's a stipulation that -- that we -- that the -- that Homeland Security would enter into.

What has been relayed to me from Homeland Security, from ICE, is that the scenario that you just -- that you just put before the court, before us, a decision to not let him continue is a decision that is from the school itself.  It's not from ICE.  That that's what ICE -- that's what Homeland Security has -- has -- that I'm -- that's represented to me that I'm representing to the Court.

THE COURT:  Okay.  Understood.

So if changing -- if terminating his SEVIS record has no effect, what's the defendant's interest in doing it?

MR. GIRDHARRY:  As the government's opposition indicates, your Honor, this again -- this comes from congressional -- the congressional mandate on Homeland Security, its authority to enforce the immigration laws, and specifically --

THE COURT:  But it's not enforcing immigration laws.  That's what you just told me.  It has no effect on immigration.  That's what you're telling me, that this doesn't affect his visa, it doesn't affect his ability to study.  You just told me it doesn't affect anything.

So if it doesn't affect anything, then there's no interest in it and it doesn't affect their ability to enforce immigration laws.

MR. GIRDHARRY:  Well, I mean, that's not -- that's not -- that's not a -- that wasn't the end of what I was going to say.  I mean, that's the beginning of immigration enforcement.  That's -- that's the government's -- it's the executive branch's, as we indicate in our briefing, its sovereign prerogative.

In this situation, this statute, 8 U.S.C. 1372, is mandated by Congress.  It gives the agency the authority to maintain -- to develop and conduct a program to collect information.  That's the language of the statute.

THE COURT:  Yeah, to collect information.

MR. GIRDHARRY:  It did.  It develops and conducts the program to collect it.  And that's the SEVIS system.  The authority to do that encompasses the authority to make determinations on the database.

And so the interest of the government is the ability to continue to -- it's to exercise its authority as mandated by Congress over this -- this collection of information and over this database that it created.

THE COURT:  How is terminating his -- his SEVIS collecting information?

MR. GIRDHARRY:  Well, the act -- the act of

20

terminating is not collecting information, but under the authority to develop and conduct -- and to collect -- shall develop and conduct a program to collect information.

So it's conducting the program.  Conducting the program is everything from collecting, to requesting additional information, to -- and whatever demarcations are in the database, active, inactive, terminated, completed, what have you.  But that's all within the authority as mandated by Congress over Homeland Security.

THE COURT:  I understand that they're authorized to create this database.  What I don't understand is if it has no practical effect on anything, what's the interest -- because, remember, what I'm tying to balance here is a preliminary injunction.  So what's the government's interest in this?  If I it just doesn't matter one way or the other, then --

MR. GIRDHARRY:  But --

THE COURT:  -- why not just issue the preliminary injunction?

MR. GIRDHARRY:  Well, I take --

THE COURT:  And I know it's not that simple.  I'm not trying to oversimplify things.

MR. GIRDHARRY:  No, I understand, your Honor, and that is one of the factors that's required for the Court to weigh.  And in the government's papers, we indicated the standard in the First Circuit and in their -- whether or not --

the balance of equities does play here --

THE COURT:  Yeah.

MR. GIRDHARRY:  -- obviously, but, also, factors related to whether or not there's an actual irreparable injury in this case --

THE COURT:  Yeah, I mean, we're -- and that's why I said -- it's hyperbole.

MR. GIRDHARRY:  Okay.

THE COURT:  I'm just trying to understand.  I'm trying to understand how all of your arguments tie together. And I was being flip, and I apologize.

Okay.  I just -- and I promise I'm going to give everybody an opportunity to be in the hot seat.

I'm just trying to understand the separation between this record and the student's F-1 status.

So your argument is that DHS has the right to terminate a student's F-1 record in SEVIS, even when it doesn't have any intention of doing anything to the student's F-1 status.  Is that correct?

MR. GIRDHARRY:  That's one scenario.  That is -- that is correct.  And, also, there are other scenarios that -- I mean, there are cases cited in our briefing where one action -- there were the two actions.  There was --

THE COURT:  Yeah, but that's not my question.  My question is that DHS has the authority to do anything it wants

to these records.

MR. GIRDHARRY:  To these records, correct, your Honor.

THE COURT:  Totally irrelevant what else is going on.  They can -- they could just go in and terminate everybody's SEVIS records if they wanted to and there would be nothing that the judges could do about it.  Is that your argument?

MR. GIRDHARRY:  The discretion -- they have wide discretion to take action as it relates to the database.  That is correct, your Honor.

THE COURT:  Okay.  And it doesn't matter whether or how that would affect the students or the universities and colleges involved?

MR. GIRDHARRY:  Well, as the papers indicate, your Honor, the termination of the database alone does not, and we've -- I mean, we're --

THE COURT:  Yeah.

MR. GIRDHARRY:  I mean, I'm going back in a circle here, I apologize, your Honor, but just to make a point.

THE COURT:  No, that's okay.

MR. GIRDHARRY:  It does not terminate the nonimmigrant status.  So that's directly -- that's what we're talking about, an effect on the student.

THE COURT:  Okay.  Does anything about the SEVIS

records -- so would Dartmouth's ability to participate in the Student and Exchange Visitor Program hinge on the way that it interacts with SEVIS, the way that it maintains, the way that it educates students, the way -- does it -- does that hinge on it?  I mean --

MR. GIRDHARRY:  There are factors, yes, your Honor, there are.  For instance, if there is false information entered into SEVIS --

THE COURT:  Okay.

MR. GIRDHARRY:  I mean, first, a school -- I'm assuming Dartmouth -- I don't know the answer, but I'm assuming it's been part of this program for a while or at least since its inception.  Other schools are new and they have to apply for certification.  Schools that are already SEVP-certified, they have to be recertified after a certain amount of time.  And all of that is -- the basis for that is they're reviewed on things like whether or not false information, accuracy of things, if there are things that are done by the designated school officials, whether or not they're -- they've committed violations or anything along those lines.  That's where a check on whether or not they can be certified or continue to be certified would occur.

THE COURT:  So allowing Mr. Liu to participate in the Ph.D. program, though, wouldn't be considered a problem.  It doesn't matter that his record's been terminated.

24

MR. GIRDHARRY:  He can continue to go to school and any determination that he could not go to school based on the facts before us now would be a determination from the school.

THE COURT:  No, I'm -- but I'm asking would there be any negative implication for Dartmouth if they continued to allow the plaintiff to go to school because his record's been terminated in SEVIS.

MR. GIRDHARRY:  Well -- and, to be clear, Dartmouth is not part of this case.

THE COURT:  I'm just asking you a question.  I'm just trying to understand the universe.

MR. GIRDHARRY:  I -- I don't know if I can answer -- I can answer that question specifically.  I don't know -- again, a determination -- again, that is making assumptions that there's nothing else -- you know, there's no other issues we're talking about here as it relates to maintenance and participation as a SEVP school.  I don't know.  And those -- those facts are not before us on this record.

THE COURT:  Okay.  Okay.  All right.  I'm going to turn to the plaintiffs now and I'm going to ask you the same questions, essentially.  I'm trying to figure out, as you know, you know, what's the evidence here that we're talking about F-1 status and not a record.

MR. KIM:  Correct, your Honor.

The problem -- so we agree that SEVIS record can be

terminated, but not the F-1 student status.  It's possible.  But in this case, that's not the case here.

And I understand my brother is advocating for the his client's best interest, but then the client's affidavit, particularly 11, paragraph 11, doesn't actually say that.  It only says SEVP, which is a database management administrator, has never claimed it had terminated Mr. Liu's nonimmigrant status and this practice of university letter termination of SEVIS, but then expects schools and everyone else, and including an agency within the Department of Homeland Security, to construe as their status was not terminated.  That has never really happened.

So let me start with the example that my brother said, whether Dartmouth can issue a new I-20 for to allow Mr. Liu to leave and come back, assuming that his visa has not been revoked.  That's not possible.  Because Dartmouth cannot issue new I-20 with terminated record unless Dartmouth creates a new -- the new student -- the SEVIS record.  The only way for Dartmouth to issue I-20 is for the reinstatement purposes.

And we can't blame the Dartmouth student because if you look at the SEVIS -- and for the purpose of this hearing, I will go along with SEVIS because that's my -- what my cocounsel has insisted that I should do it, so I will just say SEVIS.

The website says once the SEVIS is terminated, the student cannot work on or off campus.  The ICE agent may

investigate for the departure of the student.  And --

THE COURT:  And this is the website you're talking about that you cite to in your reply at page 5?

MR. KIM:  Correct, your Honor.

THE COURT:  Okay.

MR. KIM:  And student cannot reenter United States.

So if the government's position to distinguish the SEVIS record termination and F-1 status in this case, particularly in this case, it just makes no logical sense.

Now, I understand there might be some scenarios where the school -- designated school official, the DSO, made a mistake of terminating the student status.  I'm sorry, the SEVIS record.  But then there is a way to cure that mistake by requesting to correct the SEVIS record.  Dartmouth tried to do that and that didn't work.

So I'll be very practical and realistic that expecting university to completely distinguish the SEVIS record termination from the F-1 student status termination when the government's own website says that no employment is authorized, the person cannot reenter the United States, and ICE agent may investigate to confirm whether the person has been deported from the United States.

And on top of that, on April 4th of 2025, that's when the government agreed that -- that the SEVIS record was terminated.  The reasoning for that termination was otherwise

27

failing to maintain status.

So, again, it makes no logical sense to expect Dartmouth to think that Mr. Liu's student status was not terminated when the notation of the SEVIS record actually said, again, quoting, otherwise failing to maintain status.

And, in fact, the declaration doesn't even say the -- the update to the notation of the SEVIS record because that happened on or about April 8th and the affidavit is silent on that point.

So we interpret that as the actual basis of the SEVIS termination was on April 4th and whatever happened April 8th, we do not know, but it was not -- for example, it was not a case where Mr. Liu's status -- the record was terminated, reactivated, and terminated again.

Now, that's not the only evidence.  The USCIS, it's an agency with the Department of Homeland Security.  We also provided the example that for another student they interpreted the SEVIS record termination as out of status.

THE COURT:  This is Exhibit Q?

MR. KIM:  Correct, your Honor.

THE COURT:  Okay.

MR. KIM:  And I do not know whether the government will address that issue, whether that's correct or not, but at least for now that's the evidence that -- leading to the conclusion that his status was terminated.

Now, of course, we would more than happy to lean into the stipulation that Mr. Liu's status was not terminated, therefore, he should be able to continue working, engaging in research, being able to return to the United States, assuming that his visa was not revoked. But unless the government can stipulate to that, no agency, university, and everyone else except defendants would understood the termination of the SEVIS record as not termination of the F-1 student status.

THE COURT: Okay. And I just want to clarify. I mean, I asked you -- I feel like the stipulation I asked you for was broader. I just want to clarify for the record that the defendants are not willing to set -- to stipulate that the defendant's (sic) F-1 student status is not revoked.

MR. GIRDHARRY: At this time, your Honor, I can't answer that question. I can -- I can answer -- I would have to consult with the client agencies and I can get back to -- I can respond to that.

THE COURT: But -- but I think that clarifies it for me. I mean, I didn't read your papers to actually argue that it hasn't been revoked, only that you haven't affirmatively stated that it has been revoked and I think you've just answered my question. So I think we're okay.

MR. KIM: So based on all these five reasons, even in the absence of government's explicit confirmation one way or the other and all the evidence leading to the conclusion that

Mr. Liu's F-1 student status was terminated on April 4th when the SEVIS record was terminated, therefore, this Court has jurisdiction over the -- Mr. Liu's APA claim and based on that, this Court should find that Mr. --

THE COURT:  We're going to get to that.

MR. KIM:  Yes.

THE COURT:  We've got more to get to before we get to whether we've got the APA claim.

I -- have you -- defendants, have you guys had an opportunity to look at Exhibit Q, which was filed as document number 18.1 -- or it's -- there's an addendum, document 18, and then 18-1 is the actual exhibit.

MR. GIRDHARRY:  Yes, your Honor, we have.

THE COURT:  Do you have any thoughts on that?

MR. GIRDHARRY:  Absolutely.

THE COURT:  Okay.  I thought you might.

MR. GIRDHARRY:  Yeah.  I'm happy to address that, your Honor.

THE COURT:  Yeah, go ahead.

MR. GIRDHARRY:  So there's -- there's several things with this document.  Obviously plaintiffs have provided this document and asserted that it contradicts the government's position or it contradicts language in the Watson declaration.

And that is absolutely incorrect, your Honor.  This addendum is -- is an inaccurate and misrepresentation of the

situation and it's distinguishable for many reasons.

And let me start by saying this. This -- this is from USCIS. This is from an agency that's not part of this litigation.

Second, it's about -- it addresses a person who is not part of this litigation, has no ties to this case, and it's an adjudication of -- it's an adjudication -- it's a request for adjudication of benefits that would be conducted by USCIS, not by -- not by ICE.

THE COURT: But you -- but you can -- you agree with me that I can rely on -- if an agency is involved in this case, I can rely on the agency's only interpretation of its own -- of its own guidelines and its -- and its own -- its own -- I don't know how to describe this, but it -- it -- its own database, I guess.

MR. GIRDHARRY: This is a subagency of DHS. ICE is a subagent of DHS. I understand what you're saying and, yes, your Honor, you can, but if I could continue to distinguish it because it doesn't carry any weight. It carries very little, if any, weight in this case for many reasons.

And if we get into this document and -- first of all, it mentions that this person had their visa revoked. That's not the case in this situation. We don't know why the visa was revoked. There are -- under State Department's authority 8 U.S.C. 1201(i), there are different ways to revoke

a visa and they have different consequences.  That's not clear from this what those are.

This document indicates that this person was arrested or had criminal activity.  I think there was an arrest on February 22nd, 2025.  It doesn't indicate what the criminal activity was, what -- if it was a crime of violence or not. We're not -- it doesn't make any mention of that.

And this is a change of status request.  This is a change of status from a request with USCIS from F-1 student status to H-1B, specialty non-occupation work to nonimmigrant worker.  That's not what we're talking about here.  Mr. Liu has never made an application like that.  He is not looking to change his status.  And with a change of status, that is a discretionary determination by USCIS, by statute, by 8 U.S.C. 1258.  So whether or not the agency can grant a change of status from one nonimmigrant status to another, that's a discretionary determination.

And, most importantly, your Honor, this is not a final agency action of any kind.  This is called a Notice of Intent to Deny.  Well, you know, this is not actually not my most important point, but this is the second most important point.  This is not a final agency action.  So it's a Notice of Intent to Deny.  What does that mean?  That the agency was -- in the process of adjudicating this benefits request, went through the information presented to it, went through the

records, and -- and derogatory information came up about the case.

And with that said, they put that into this document and they issued it to this person, and they've given him until -- if you take a look at the last page, they've given him until May 21st, 2025, to submit evidence to rebut the claims or rebut what -- what USCIS has presented to him and why they're saying to him, this person, that he may or may not be eligible for what he's asking for.

Can he overcome these grounds?  If he -- he has an opportunity to overcome them with legal argument and new facts.

So --

THE COURT:  I'd be -- I'll give you an opportunity to talk more about it, but --

MR. GIRDHARRY:  If I could make one more point, your Honor.

THE COURT:  Yeah, sure.

MR. GIRDHARRY:  And so consulting with -- consulting with the agency, they've indicated to me that that statement --

THE COURT:  What, the according to the beneficiary SEVIS record?

MR. GIRDHARRY:  Yeah.  That their non -- F-1 nonimmigrant status was terminated on April 10 because of criminal records check and the revocation of the F-1 visa.

The connection between termination of SEVIS and

termination of F-1 student status, that is not legally correct. That's what the agencies indicated.

THE COURT:  Do you have an affidavit or something to that effect?

MR. GIRDHARRY:  I don't have that because we -- that was just -- I mean, this was just filed yesterday and I was able to get that information this morning prior to this.  But we can provide -- we can provide that at some time after this hearing.  But that is -- that's the point I wanted to make on that.

So for all of these reasons -- and, also, adjudication is one thing.  Unless its designated as precedential, it's not -- they don't bind the agency on other things.  These are administrative actions.  But, again --

THE COURT:  I understand.

MR. GIRDHARRY:  -- this is a nonfinal determination. This is just comments in one document that -- I mean, there are -- I don't want to -- there's tons of these things being filed and this was kicked back by one adjudicator indicating this.

And, again, this is -- they have an opportunity to rebut this.  And then especially with that statement that -- that the agency has indicated to me that this is not -- that is not legally correct.

THE COURT:  Okay.  I appreciate that.

MR. GIRDHARRY:  Thank you.

THE COURT:  Any response to that?

MR. KIM:  Yeah, I understand it's not the final action.  It goes to the intent to deny.  And I hope that the student -- it appears that the government actually identified who this person was based on the application number and my hope is that -- I hope that the government would reissue that and then grant a -- not consider the SEVIS record termination as out of status.

But even putting that evidence aside, the government has failed to explain then why the government included otherwise failing to maintain status for the reason for the termination.

THE COURT:  On April 4th for the plaintiff?

MR. KIM:  Correct, your Honor.

THE COURT:  Understood.

MR. KIM:  Because, again, I'm going to be as objective as possible, even though I'm an advocate for the plaintiff.

From the university's perspective, once they have received this reasoning of otherwise failing to maintain status, then from -- at least from the government's perspective, he failed to maintain status.  So the SEVIS record is terminated and then because university thought that there might be a mistake happen, not only Dartmouth, but other

schools have tried to correct that -- the reasoning and status. It didn't work.

So it is unreasonable and illogical for the government to expect that the plaintiff's student status was not terminated when the government has said he failed to maintain status.

THE COURT:  I don't think I have in the record any response from the government to Dartmouth's attempts to correct -- to correct the SEVIS status when it was changed. You didn't submit that as a --

MR. KIM:  There was --

THE COURT:  There were some emails in -- attached, but was there -- was there a government response to a Dartmouth attempt to change the SEVIS status back after April 4th?

MR. KIM:  So there was an email from the Dartmouth school explaining to Mr. Liu, because Mr. Liu asked the school to fix --

THE COURT:  Right.

MR. KIM:  -- and then explained that schools have attempted to correct -- to fix the data with corrections and SEVP did not honor that.

THE COURT:  Right.  But there's no response from the government to Dartmouth's attempt to actually try to fix Mr. Liu's status.

MR. KIM:  Correct.

THE COURT:  Okay.  Not status.

MR. KIM:  Yes.

THE COURT:  Okay.

MR. KIM:  Yes.

THE COURT:  Understood.  I just wanted to make sure I didn't overlook an exhibit.

MR. KIM:  So based on that, again, and also, not only that, but government still fails to explain the agency's own website again.  Then why the government created that website explaining that once a SEVIS record is terminated, a student cannot work on campus, off campus; why student then could be investigated by ICE agents, just to confirm whether student has been deported from the United States or not, if the government's position is that the SEVIS record is just a clerical database, has nothing to do with the student status and -- and cannot reenter United States.

And it makes sense, because that's precisely what happened in 2021 to Mr. Liu.  So his SEVIS record was not activated.  So when he came back to the United States through Detroit, even though he had a valid visa, Customs and Border Protection did not allow him to come into the country.

Now, Mr. Watson's declaration actually said he was not admissible under 8 U.S.C. 1182.  So I actually looked up which provision -- under which provision that would trigger an inactivation of SEVIS as a basis to find someone not admissible

to the United States.  I could not find any provision.  The only provision that I could -- because Mr. Watson did not actually specify the provision -- specific provision within 1182, the best that could be close to the admissibility would be (a)(7), which is about whether the nonimmigrant had a valid document, such as visa, but then he had a visa.

So because -- so what plaintiff is trying to explain is it is consistent, the way that the SEVIS record termination functions with the termination of F-1 student status, even at the border for the admissibility.  Even though Mr. Liu had a valid visa, CBP did not allow Mr. Liu to come in, even after confirming with the Wake Forest University that he was actually a student, it was just mistake or misunderstanding, mistake, because even the DHS website says without activation of SEVIS record, the student cannot enter the United States.

And government does not explain to all of these points and expect the university, Mr. Liu, and this Court to suddenly distinguish SEVIS -- university letter SEVIS record termination as completely different from the F-1 student status termination.

All of this evidence leads to the conclusion that on April 4th, Mr. Liu's student status was terminated when -- as reflected on SEVIS record termination.  And if there's any ambiguity as to the reasoning for that SEVIS record termination, the government provide it, failing to maintain

status.

THE COURT:  Any response from the defendants?

MR. GIRDHARRY:  Yes, your Honor.  Thank you.

A couple of points here.  Let me start with the messages from the school to Mr. Liu on April 4th and April 8th.

The first one received, obviously, was April 4th, indicating otherwise failing to maintain status.  That's what the SEVIS database produced.  That's what was sent to the DSO at the school and that's what was relayed to Mr. Liu.

And then on April 8th, it says termination reason, well, that's what -- that's the school's line, but it would say other, individual identified in criminal records check and/or has had their visa revoked, SEVIS record has been terminated.

I don't see how we can ignore the April 8th message and say that it didn't -- doesn't exist.  And plaintiff wants -- is putting before the Court that the April 4th message is the message, end of story.  This is a -- this is a correction of the bases for termination or the -- the notice of termination provided to the school.

THE COURT:  But do you see my problem?  The defendants haven't provided -- I mean, you did submit a declaration and in that declaration you could have put that there was an erroneous notification that attributed to the change to the database, erroneously to a failure to maintain status, but that was wrong and there wasn't a failure to

maintain status, and, actually, it's other, and that's what we meant. But I don't have that declaration and so I'm required to try to piece together --

MR. GIRDHARRY: I understand, your Honor.

THE COURT: -- this -- this record that I have in front of me.

MR. GIRDHARRY: I understand. And -- but, also, on that second email, the April 8th, the April 8th email from the school to Mr. Liu, the school specifically said to him, I'm hearing from other schools that they're seeing the same change in terminating status records. The corrections were made from the agency. The database -- I mean, it's not the -- it has very limited or predetermined drop-downs, I guess you'd call them, or choices, when you select for the reasons for termination, and they range from all the different reasons you can be terminated. The correction was made to other and to indicate that criminal records check and/or has their visa revoked indicated -- and, again, there's to allegation before this Court that the visa -- that Mr. Liu's visa was revoked.

THE COURT: I think -- I don't think anybody's arguing the visa's been revoked or challenging that it has been revoked, because I think everybody agrees that that wouldn't be before me. That's not -- this isn't the proper way to challenge that.

MR. GIRDHARRY: And I'm raising that because that's

the term used here.  It says other here.  So if it's not that, then it's based on the records check and the records check was done.  And --

THE COURT:  Well, that's in both entries.

MR. GIRDHARRY:  It -- but it removes the incorrect determination from the first -- the April 4th -- the April 4th language.  And it was sent and was updated.  And as the school has confirmed, they've seen that happen in other cases.

THE COURT:  But you're -- I mean, you're arguing it was an incorrect determination without any evidence that it was an incorrect determination.

MR. GIRDHARRY:  But it was -- it was corrected, your Honor.  So, I mean -- I mean --

THE COURT:  Well, it was changed.  I don't know whether it was corrected.  It was changed.  So there -- there's a difference between those two things.

And -- and coupled with the rest of the evidence that -- that there is actually a change in status that accompanies this -- this change in the SEVIS record, that's -- what I'm lacking from you is any -- any evidence that there -- that the SEVIS record is on a manifestation of the actual change in status.  I don't have that.  What I have is an argument that it could be divorced, but I have no evidence --

MR. GIRDHARRY:  We --

THE COURT:  -- that it's divorced.

MR. GIRDHARRY:  The Watson declaration, your Honor, indicates that, that the record -- that the status has not been terminated.

THE COURT:  No, it does not.  The Watson declaration indicates we have never argued that we did terminate it.  That is not the same thing.  It's just not.

MR. GIRDHARRY:  It says --

THE COURT:  I've never argued -- you know, there are many things I've never argued.  That doesn't make them true.

MR. GIRDHARRY:  Your Honor, if I could just read the language in number 11:  Terminating a record in SEVIS does not terminate an individuals's nonimmigrant status in the United States.

THE COURT:  That doesn't mean that it doesn't -- okay.  What is the point of SEVIS if it is not to accurately reflect the status of the individuals in the database?

MR. GIRDHARRY:  That is -- that is a purpose of SEVIS.  And SEVIS is -- that is what falls under the authority -- DHS's authority as mandated by Congress.

And one of the things -- this goes to what you're asking, your Honor.  The language on the website that we're talking about, termination or what have you.  It's not as -- it's not as clear as it could be, but it does not differentiate between termination alone and termination that occurs with a termination of status.  Those are two different things.

And by all of these things that may or may not happen, reference to ICE agents appearing for investigation, I mean, that is -- that can happen at any point, under any situation. That doesn't -- that isn't necessarily related to termination of SEVIS or what have you. I mean, it will happen and it indicates that, but, again, the website language does not differentiate between terminating -- the record and the database alone while the person's --

THE COURT: In fact, the language on the website doesn't suggest that it's even possible to differentiate between those two things.

MR. GIRDHARRY: As I mentioned, your Honor, it's not the clearest, but it's just -- it's language on the website. It's supposed to try and provide guidance. It's guidance language. It's not -- it's not a legal determination on the -- on the website. It's just guidance. And that can be corrected also and it happens all the time when -- when government databases, government websites, are -- relay incorrect information or they require revision based on whatever may or may not happen.

THE COURT: I mean, you just keep bringing me back to the same question, though. What is the point of changing Mr. Lui -- of terminating Mr. Liu's record? What's the point? Why terminate it?

MR. GIRDHARRY: It's an action that is within the

43

authority of Homeland Security.

THE COURT:  No, I'm not asking where Homeland Security gets its authority.

Why did Homeland Security terminate Mr. Liu's record if not to reflect that it had terminated his student status?

MR. GIRDHARRY:  Well, they've terminated his -- in this case, they terminated his record based on the records check and finding that he had that hit on the records check.

THE COURT:  Yeah, but for what -- what does that do? What does it accomplish?

MR. GIRDHARRY:  It -- that's -- that type -- that action, again, is a determination that Homeland Security is making for -- based on their discretionary authority to conduct -- to develop and conduct a program and collect information.

THE COURT:  All right.  Let's go to the actual -- I mean, all of this is a very important component to the defenses that the defendant has brought into the opposition and normally I would start with the plaintiffs on a motion like this, but because we already had the TRO -- oh, go ahead.

MR. GIRDHARRY:  Actually, your Honor, I just thought of a point before we move on.

THE COURT:  Yeah, please.

MR. GIRDHARRY:  I think it was mentioned, but it wasn't really kind of -- it was -- wasn't really fleshed out.

44

So one of the things then regarding this administrative remedy called reinstatement.

THE COURT:  Uh-huh.

MR. GIRDHARRY:  Reinstatement exists in situations --

THE COURT:  Yes.

MR. GIRDHARRY:  -- when a person, specifically, an F-1 student, has -- there is some type of indication or -- of their failure to maintain status, be that from most likely -- I guess a typical scenario is from the school; there's a violation of school policy, they stop going to class, something along those lines, maybe there's a mistake, and they have been -- whether or not their status -- maybe their status is in jeopardy or what have you.

There is an administrative remedy available where you make this application to USCIS for the USCIS to make it -- to take a look at the facts and say whether or not the person is in -- has violated their status or maintained their status and whether or not they can be put back in a status, put back in their status, I guess, if that is the case.

That is an option that is available.  Again, the government is advancing here that status has not been terminated and, I mean, if that's something that -- that Mr. Liu feels like there's a disagreement on, that option is available for him to pursue and to try and get a determination

from USCIS on whether or not his status has been, in fact, terminated.

THE COURT:  So are you suggesting that he could apply for reinstatement of his status, notwithstanding the government's position that his status has not been terminated?

MR. GIRDHARRY:  That sounds a little circular, but that is -- if he's disagreeing with --

THE COURT:  A bit Kafkaesque.

MR. GIRDHARRY:  If he is disagreeing, if there's a disagreement on that, that there isn't an administrative option to make that determination.

Again, I -- if we're saying that, again, based on the Watson declaration that status has not been -- termination in the database does not equate to termination of status, then, I mean, that's -- that's --

THE COURT:  Okay.

MR. GIRDHARRY:  Yeah, that's that.  Thank you.

THE COURT:  Understood.  And I just want to -- so for the purposes of -- of reinstatement, the government's position, and will be forever, is that Mr. Liu is not out of status and so he's not accruing time out of status if he were to be deprived of preliminary relief; is that where the government is and would be willing to entertain a stipulation to that effect?

MR. GIRDHARRY:  Well, we don't need to stipulate to

46

that, your Honor.  That's legally correct.  Again, he's been admitted for duration of status.

THE COURT:  Okay.

MR. GIRDHARRY:  And duration of status, in order for a person who is admitted in duration of status to start to accrue unlawful presence, it requires an adjudication from either USCIS or a determination from an immigration judge.

And, for instance, in the situation -- the hypo that I raised before, the school has an issue with somebody and they've failed to maintain their status, and say they apply for reinstatement or --

THE COURT:  Wait.  I'm confused.

MR. GIRDHARRY:  Uh-huh.

THE COURT:  I thought that if a student -- let me just get the steps right.

But if the plaintiffs are right and the change in the record reflects that his F-1 status has been revoked or changed, then he is out of status?

MR. GIRDHARRY:  If plaintiffs are correct?

THE COURT:  If plaintiff is correct and that this change in his SEVIS record actually accurately reflects that his status has been changed, then he is out of status right now, right?

MR. GIRDHARRY:  The status that he is holding, F-1?

THE COURT:  Yeah.

MR. GIRDHARRY:  Again, not conceding anything, not --

THE COURT:  Understood.  That's why I said it with if.

MR. GIRDHARRY:  Yeah.  If his status is terminated, then his status is terminated.  Correct.  He's no longer holding F-1 status.

THE COURT:  Okay.  That's a hypothetical.

MR. GIRDHARRY:  No, right, correct.  But he's admitted for the duration of status.  So the accrual of unlawful presence is a different question.

THE COURT:  Okay.

MR. GIRDHARRY:  And, again, that takes a determination from either USCIS and a denial of benefits or an immigration judge after any proceedings to say that, yes, whatever violation you've committed, you have committed it and then the day after either one of those determinations are made is when the clock on an unlawful presence starts to start ticking.  That's the 2009 memo.  I think we attached -- we cited to that in our papers.

THE COURT:  I think you did.

MR. GIRDHARRY:  Yeah.  So that's the accrual of unlawful presence for a person holding duration of status.

THE COURT:  Okay.  Okay.  I think it's the right time to ask the court reporter if she would like a break.  And

48

you've been very -- you don't have to take this.

(Off-the-record discussion.)

THE COURT:  When we return from a brief recess, we will probably switch to -- I'll let you -- I'll give you an opportunity to say anything you think of during the break and then we'll probably switch to the defendant's arguments in the -- in the opposition on likelihood of success.

Okay.

THE CLERK:  All rise.

(Recess taken from 2:37 p.m. until 2:55 p.m.)

THE COURT:  Okay.  Okay.  As promised, does anybody -- anybody have any brilliant ideas during the break that they want to share with me before we move on?

Okay.  I fear you might be like me.  Mine was always when I was driving home from the courthouse, which is usually the worst possibility.

Okay.  So as I was saying before, normally, obviously, I would start with the plaintiff, but since we had a temporary restraining order hearing, I'm pretty familiar with the plaintiff's arguments on the likelihood of success and they're pretty straightforward.  But the -- but the defendant's opposition really is grouped into a pretty nice framework, I think, that'll frame the hearing in a better way.  No offense to the plaintiffs.

So what I'd like to do is follow the defendant's

framework, especially since two of the defendant's arguments are jurisdictional. So what I'd like to do is start with those.

The first -- and, if I might -- you know, I think everybody knows what they are, but the three main defense arguments are no case or controversy, that there's still sovereign immunity because the APA waiver doesn't apply due to the application of the Privacy Act, and that there's no final agency action.

There's kind of a fourth potential argument that's like snuck in there without a header that the defendants are not limited to the regulatory authority enumerated in 8 C.F.R. Section 214.1(d). We'll get to that. I'd like to touch on that, if we might.

But let's start with no case or controversy. We don't need to go through these in a rote manner. So much of all of these arguments are dependent upon the conversation we've been having thus far in this hearing, but, like I said, I promised I was going to give you an opportunity to make the record that you want to make and I'm going to try to deliver on that promise.

And so this one especially is really deeply rooted in the conversation we've already had, but I'm going to let the plaintiff go first on this one, on no case or controversy.

Is there anything you'd like to add to what we've

already discussed with respect to no case or controversy?

MR. KIM: I don't want to spend much time just repeating everything. Just to summarize our point, just again for the record, is that there's case -- there's case and controversy. Defendants terminated the F-1 student status on April 4th with the specific reasoning that he failed to maintain status.

Now, because of that issue, the student, Mr. Liu, was not able to continue engaging in research or being paid, engage in any employment, which is consistent with how defendant have advertised on the website. And the school reasonably understood it, particularly because of the failing to maintain status, did not allow Mr. Liu to continue engaging in research.

So there is case and controversy. The defendants terminated F-1 status and that -- and because of that, Mr. Liu lost the privilege and right of F-1 student status in the United States and this Court can entertain and address that claim.

THE COURT: Okay.

Defendants.

MR. GIRDHARRY: Thank you, your Honor.

I think the -- the government's argument is -- is fully briefed in its papers, but just to clarify.

Based on what the Watson declaration says, Mr. Liu's

status has not been terminated and this case was presented -- it -- it's about a -- a changing in a data field in the SEVIS database.

And as it relates to his status for the duration of status, the government refers to the document from USCIS attached in the hyperlink.  And, also, I believe plaintiff had attached a declaration from -- I have here Plaintiff's Exhibit N, ECF number 14 at paragraph 13, where they concede that duration of status -- his status -- someone in that status does not simply fall out of status.  They have to have a determination from USCIS or an immigration judge that their status has ended.

And so if this case -- this case is brought before this Court challenging a termination of status, which has not occurred in this case, and that's why the government argues that there's no case or controversy in this action.

THE COURT:  I'm just trying to understand, though. I mean, I think that the plaintiff's argument is that because that's the only way a termination is supposed to happen, that's the problem in this case.

Am I right?

MR. KIM:  Correct, your Honor.

THE COURT:  Okay.  So it's not as though the plaintiff and the defendant agree that that termination hasn't happened because that's the only way a termination can happen;

it's that the plaintiff is arguing that's the only way a termination is supposed to happen and yet there's been a termination in this case without the proper steps.

Correct?

MR. GIRDHARRY:  And the way a termination is supposed to happen, you're referring to C.F.R. 214.1(d)?

THE COURT:  I mean, under certain circumstances, yes.

MR. GIRDHARRY:  Okay.  And that has not occurred in this case.

THE COURT:  I think everybody agrees that has not occurred in this case.  The defendants agree that hasn't occurred.

MR. KIM:  For plaintiff, yes, correct.

THE COURT:  Okay.  And defendant agrees that hasn't occurred -- has not occurred in this case.

MR. GIRDHARRY:  Has not occurred in this case.

So, again, that's being -- plaintiff's asserting that the status has been terminated here.  Again, the government's position is that it has not been terminated.  And if that's the challenge before this Court, then that's -- that's not a proper challenge before this Court.

THE COURT:  Okay.  But, again, the government is arguing that the status has not been terminated, but the government is not willing to submit an affidavit or a

stipulation that the status has not been terminated.  Correct?

MR. GIRDHARRY:  The declaration, the Watson declaration, is the --

THE COURT:  That's as close as we're going to get.

MR. GIRDHARRY:  -- is the confirmation that the status has not been terminated.

THE COURT:  Okay.  Okay.  Anything else on case or controversy?

MR. KIM:  No, your Honor, for plaintiff.

THE COURT:  Okay.

MR. GIRDHARRY:  Nothing from the defendants, your Honor.  Thank you.

THE COURT:  Okay.  The second jurisdictional argument is that the waiver of sovereign immunity under the Administrative Procedures Act is to be strictly construed.

And I think everybody agrees on that.  Correct?

MR. KIM:  Yes, your Honor.

THE COURT:  Okay.  And that it doesn't apply here because the Privacy Act exists to address this claim.

So I just --I'm not trying to undercut anyone's argument, but just as a preliminary question for the defendants, if I find that Mr. Liu's claim is really about his F-1 student status, in other words, that his actual status has been changed and not just his record, is the Privacy Act relevant in any way to this case?

MR. GIRDHARRY:  It is, your Honor.  I mean, to the extent that -- because if there is a termination of his record in SEVIS and that's the action -- I mean, that's the -- the government's position is that's the action that's occurred here.  And if the Court wants to -- if it's determined -- again, without conceding anything, if it's determined that there is a -- the Privacy Act will still apply to any -- any -- any challenge to that information being held in that database.

THE COURT:  But I'd have to go through the *Patchak* requirement, the *Patchak* factors, right?  Under *Patchak*, I --

MR. GIRDHARRY:  Yeah.

THE COURT:  Okay.  So the statue must address the same type of grievance the plaintiff asserts in this suit.

So if what this -- if this case is really about his student status and not about his record, is the Privacy Act -- is the government contending -- not the government, but the defendants -- are the defendants contending that the Privacy Act is the statute that addresses --

MR. GIRDHARRY:  If you're -- if the Court's -- if we're talking specifically, solely, about whether or not the -- about the termination, then I don't believe the Privacy Act will apply to that.

THE COURT:  Okay.  Then that was what I -- that was my question.  If the Court determines that this case is actually challenging the -- the change in SEVIS because it

55

reflects accurately the change in his student status, not the change in SEVIS because it's just a record floating out there, totally devoid of connection --

MR. GIRDHARRY:  To be clear --

THE COURT:  -- to his status --

MR. GIRDHARRY:  To be clear, your Honor, if it's still a determination on the change in the SEVIS record, then the Privacy Act will apply.  If we're talking about whether or not his status has been terminated separate from the SEVIS termination, the Privacy Act will not apply to a determination or a challenge specific to whether or not his status has been terminated.

THE COURT:  Okay.  Plaintiffs, are you challenging the SEVIS record or are you challenging the F-1 student status?

MR. KIM:  Just the F-1 status, your Honor.

THE COURT:  Just the status.

MR. KIM:  Yes.

THE COURT:  Okay.  Does the Privacy Act apply?

MR. GIRDHARRY:  If it's just the -- again, if it's just the status without the SEVIS -- and if they're conceding the termination is in the database, there's a termination, and that's -- that's what's occurred here.

THE COURT:  Uh-huh.

MR. GIRDHARRY:  And we're challenging whether or not Mr. Liu's holding status right now.

THE COURT: Uh-huh.

MR. GIRDHARRY: The Privacy Act will not apply to that.

THE COURT: Okay. Okay. Anything else anybody wants to say about the Privacy Act?

MR. KIM: No, your Honor, from plaintiff.

THE COURT: Okay.

MR. GIRDHARRY: On that, no, your Honor.

THE COURT: Okay.

MR. GIRDHARRY: But we're talking about the final agency action next, right?

THE COURT: Yes. We're going to -- we're moving to that next.

MR. GIRDHARRY: Thank you.

THE COURT: Okay. Final agency action.

Plaintiffs, final agency action.

MR. KIM: Yes, your Honor.

As we have discussed, there's a final agency action. The defendants -- when defendant terminated the SEVIS record on April 4th, they made it very clear. Again, the government still has not explained that -- and does not even refute or dispute in the affidavit that they terminated because plaintiff failed to maintain -- otherwise failing to maintain status. The plaintiff's status was terminated and that creates the final agency action that this Court has jurisdiction over the

claim under APA.

THE COURT:  Okay.

MR. KIM:  If there's any ambiguity to it, the reasoning for defendants to terminate his SEVIS record on April 4th, that has been, again, not refuted through the sworn affidavit.  That is the credible evidence that there's final agency action.  So this Court has jurisdiction over the claim.

THE COURT:  Okay.

Defendants.

MR. GIRDHARRY:  Your Honor, what's before this Court is not a final agency action.  We're talking about termination in the SEVIS database without -- I mean -- I beg the Court's indulgence, going back to --

THE COURT:  Yes, please do.

MR. GIRDHARRY:  -- the point which we're referencing here.

This case is about the change in the data -- in the record in the database.  That is not a final agency action.  It does not pass the *Bennett* test because as the declaration -- as the Watson declaration indicates, SEVP has no authority to terminate the status.  Terminating a record in SEVIS alone does not terminate nonimmigrant status.  Those are in paragraphs 11 and 12 of the Watson declaration.

Plaintiffs have raised again the April 4th -- the message generated on April 4th and said that there's been no

58

explanation or refuting of that.  As has been presented to the Court, that occurred, the -- the agency corrected the message and sent out the corrected message on April 8th.  And other -- and as the school indicated to Mr. Liu, it has acknowledged that other schools have received a similar corrected or updated message from the SEVIS -- on SEVIS records.

THE COURT:  Okay.  The government's not made any arguments that this has been mooted out because of the corrected message or -- as I said, there's no sworn statement, there's no explanation for the corrected message, there's no explanation for the prior -- the prior message, and you're not at this point prepared to offer me any explanation or other argument --

MR. GIRDHARRY:  Other than --

THE COURT:  -- other than what's in your papers.

MR. GIRDHARRY:  Other than the papers and it's a revised message and the agency is within its rights to correct any --

THE COURT:  Okay.

MR. GIRDHARRY:  -- information that's put out.

THE COURT:  I just want to go back to the *Bennett* factors.

Even if it is just the record, isn't it a consummation of an agency's decision-making process to -- to change the record?  Even if I agree with you ultimately that

this is -- that this is just -- his record's been terminated, how is that not the consummation of the agency's decision-making process?

MR. GIRDHARRY:  It has to have a legal effect, though, your Honor.

THE COURT:  Well, it does have a legal effect.  I mean, whether -- whether it's the agency's -- does it have to be a legal effect that the agency is giving it or does it just have to have a legal effect?  I mean, it is having a legal effect.  It is -- it is interfering -- the application of that record interferes with his ability to enter the country, for instance.  It interferes with his ability to continue his studies.  It interferes with his ability do all sorts of things.

MR. GIRDHARRY:  Those aren't -- aren't -- aren't a hundred percent correct or accurate, your Honor.  His ability to enter the country, there's nothing stopping Mr. Liu from departing and seeking reentry in -- for whatever reason he wants to seek reentry on.  Again, the termination in the database has occurred and any determination that he's not permitted to go to class or attend school is not a determination made by -- by DHS.  That's made by the school itself.

So under the *Bennett* factors and the -- the legal consequences that would flow from this, the government's

arguing that there's -- the legal -- it doesn't pass the *Bennett* test because, again, his status, his nonimmigrant status, is separate from the termination of his record in the database.

THE COURT:  But wait.  But I just want to ask you a question under *Bennett*.

Is it -- do you believe that under *Bennett*, the legal -- the rights and obligations have to flow from the agency or -- because I don't read *Bennett* that way or its progeny.

So the agency -- there has to be a final agency decision and that decision has to affect rights and benefits.

So the -- there's a change in SEVIS and that affects Mr. Liu's rights and benefits.  Whether it affects the rights and benefits granted to him by Dartmouth or granted to him by some third party, that would still -- wouldn't that still be a final agency decision?

MR. GIRDHARRY:  I don't think so, your Honor.

THE COURT:  No?

MR. GIRDHARRY:  The -- whatever effect or whatever determination the school wants to have on him, that's not -- that's between -- that's a determination by the school.  That's not -- they're making the decision to take that.  That's not based off of -- that's not a determination from the ICE.

So I think to answer your question, coming from the

agency's action, that's where that would have to flow from.

THE COURT:  Okay.  It has to flow directly.  I mean, I understand it has to flow from the agency.  They're not completely --

MR. GIRDHARRY:  Correct.

THE COURT:  -- completely separated, of course.  But you think it has to be a right or -- it has to be a right or obligation that flows directly from the agency that makes the decision.

MR. GIRDHARRY:  I agree with that, your Honor, yes.

THE COURT:  Okay.

MR. GIRDHARRY:  And so just to sum up that argument, because we're talking about SEVIS -- termination of the SEVIS record in the database and we're not talking about termination of status that did not occur, that is not a final agency action before the Court.

THE COURT:  Okay.  All right.

Okay.  What about this half argument -- I'm not trying to minimize it, it just didn't have its own heading -- that defendants are not limited to 8 C.F.R. Section 214(d)?

And I'm not sure the plaintiffs actually disagree with you that -- but I -- I guess I just want to know from the defendant what are the other options, what are the other regulations.  Because there's an argument that the defendants are not limited to that, but there's no -- I don't think

there's any affirmative statement of what other authority the defendants may or may not have had to act here unless you're talking about the authority to maintain the database.

I'm specifically talking about pages 17 and 18 of your opposition. And if you need a moment, please feel free to take it.

MR. GIRDHARRY: Thank you, your Honor.

Well, we cite to 8 U.S.C. 1372(a)(1), which is the authority that I've referenced many times. I think the point the government is trying to make with -- the defense is trying to make here is that those provisions in 214.1(d), those lay out the -- they're not the only -- they're not the only ways that can happen. Obviously, it -- it's not a limiting -- it's not read as limiting. There are other ways. Those aren't the only ways in which termination could occur.

I think we're just -- the point of that argument is to -- is to try and emphasize the -- the authority, the discretionary authority of DHS on its ability to maintain -- to maintain its database as it relates to the SEVIS record.

THE COURT: Okay. But I'm trying to make a determination on the likelihood of success on an APA claim and whether or not the government acted in an arbitrary and capricious manner or abused its discretion or otherwise not in accordance with the law.

And so I need to know what law, you know. The --

the plaintiffs are arguing that the government didn't act in accordance with these particular regulations governing --

MR. GIRDHARRY:  Well, those regulations -- excuse me, your Honor.

THE COURT:  No, please go ahead.

MR. GIRDHARRY:  Those regulations are specific to the termination of status.

THE COURT:  Right.

MR. GIRDHARRY:  It's not just F-1.  It's any nonimmigrant status.  And so those regulations -- we're advancing that this case is about the termination of the -- the information in the database.  It's not about termination of status.

THE COURT:  Okay.

MR. GIRDHARRY:  So that wouldn't be something that would be applied here.  I think that argument that we've advanced is just that that's mentioned and those are ways in which the -- the status, if status was terminated, that's how they can be terminated, but that's not the -- they're not -- they're not limiting based on that.

But if you're asking if that's the law to apply here, not on a SEVIS database that's not.

THE COURT:  Okay.

MR. GIRDHARRY:  That regulation doesn't apply here.

THE COURT:  And if the Court finds that this case is

actually about the F-1 status and not just the SEVIS database, is there any other law that the defendants are setting forth that gave them authority other than the law set forth by the plaintiffs?

In other words, should I be considering any other authority for the defendants to terminate the F-1 student status, the status itself, other than the law set forth in the plaintiff's motions and complaint?

MR. GIRDHARRY:  No, your Honor, because, again, that's not what's -- that's not what's occurred here.  The status has not been terminated.

THE COURT:  Okay.  Okay.  Anything from the plaintiffs on that point?

MR. KIM:  Just, your Honor, we agree that, for example, putting aside the 214.1(d), if the student fails to maintain status, then student can lose the status, which is 1(d).

And what the -- and one -- the statute that defendants cited, the visa revocation, that part, the defendant -- and if there's -- if there's any relation between the visa revocation and the termination of student status, to the extent that that's possible, defendant do not -- haven't really fleshed out what authority that it had.

THE COURT:  Can you repeat that for me?

MR. KIM:  No, basically what we're trying to say is

the visa revocation, the relationship between the visa revocation and how that actually gives the government the authority to terminate F-1 student status --

THE COURT:  Uh-huh.

MR. KIM:  -- there's no relationship.  So as we have maintained the position that --

THE COURT:  Yeah.

MR. KIM:  -- even if the visa is revoked, the student can still maintain F-1 student status.

THE COURT:  Yeah, and I don't think the --

MR. KIM:  Yes.

THE COURT:  I don't think anyone is arguing that their visa's been revoked -- that the visa's been revoked.

Is the government arguing that the visa's been revoked?

MR. GIRDHARRY:  No, your Honor.  I -- Mr. Liu's visa has not been revoked.

And I think I need some clarification.  We're saying -- I just don't want -- I need some clarification on plaintiff's position now.

THE COURT:  I think it's just been that all along the plaintiff just wanted to clarify that even if his visa had been revoked, that would not give the government the authority to revoke his F-1 student status.  And I think the government has always agreed with that, that --

MR. GIRDHARRY:  Well, I think that's --

THE COURT:  -- that's not how you can revoke an F-1 student status.

MR. GIRDHARRY:  There is a way to do it.  That's not the facts in this case, though, your Honor.  I'll leave it at that.  That's a revocation that has not occurred in this case.

THE COURT:  Is that satisfactory to the plaintiff?

MR. KIM:  Again, the reason why we wanted to emphasize this sworn affidavit is critical because that's the evidence for the preliminary injunction and the defendants have not confirmed one way or the other in the affidavit whether Mr. Liu's visa has been revoked.

At the same time, at page 17 as an example, defendant cited the visa revocation as an example of terminating student status -- nonimmigrant status.  So we just want to emphasize even if we don't know it from the affidavit, even if Mr. Liu's visa has been revoked, it still does not provide -- automatically constitute the termination of F-1 student status.

THE COURT:  Okay.

MR. KIM:  We just want to emphasize that point.

THE COURT:  Understood.

Further from the defendant?

MR. GIRDHARRY:  No.  And just to be clear here, so plaintiff -- I think parties are in agreement that Mr. Liu's

visa has not been revoked here.

THE COURT:  It sounds to me like the parties are in -- well, I think the plaintiff is not certain whether Mr. Liu's visa has been revoked because there's no confirmation one way or the other, but they're certainly hoping Mr. Liu's visa has not been revoked.

MR. KIM:  And -- and, if I may, your Honor, that's important because if Mr. Liu's visa actually has not been revoked, then absent this Court's -- assuming that this Court provides the further relief or the interim protection, then that would not -- then the circumstances would not allow the defendants to lawfully detain and place the -- Mr. Liu in proceedings.  And that's significant because the statute technically says even with a -- with visa revocation standing alone can provide defendants the power to detain and place him in proceedings.

But, again, at the same time, we hope that -- I understand my brother's point, but at the same time, I -- I do not see that point, the visa revocation issue, in the sworn affidavit.  So --

THE COURT:  Yeah.

MR. KIM:  -- that's -- why we believe it was critically important.

THE COURT:  Okay.  Okay.  I just -- and I'm going to clarify again for the record, which I've done a few times in

this case, there is no evidence or allegation that there's been a visa revocation. The parties are in agreement that had there been a visa revocation, a case in this court in front of me would not be the proper avenue to challenge that revocation.

Is that the --

MR. KIM: Correct. We are not claiming -- even assuming that the visa has been revoked, and we don't have evidence the visa has been revoked.

THE COURT: Right.

MR. KIM: We just do not know.

THE COURT: Okay. And that the relief the plaintiff is requesting in this case is not an order from this Court preventing detention or deportation. It's an order from this Court specific to the F-1 student status.

MR. KIM: For the purpose of preliminary injunction --

THE COURT: Yes.

MR. KIM: -- yes, your Honor.

THE COURT: Okay. Yes. Yes, important distinction. Yes.

MR. GIRDHARRY: Okay. And just to be clear, one last point here.

So this case does not involve any allegation of visa revocation and plaintiffs have conceded that they're not challenging any decision to revoke any decision on the

revocation of Mr. Liu's visa.

THE COURT:  On the preliminary injunction.

MR. GIRDHARRY:  Okay.  And the complaint, I believe, your Honor.

THE COURT:  Well, we're talking about what's before me right now.

MR. GIRDHARRY:  Okay.

THE COURT:  I mean, if later on the defendants want to file some sort of motion to dismiss on some portions of the claims, none of that is before me right now.

So there's a motion for a preliminary injunction based on just the first two counts of the complaint requesting limited relief.  The rest of the complaint, it's not before me.  No one's made any motions and we haven't had any conversations about the viability of the rest of the complaint.

MR. GIRDHARRY:  Okay.  And just so -- just to be clear, those first two counts, there is no allegation of -- plaintiffs make no allegation of revocation of the visa.

THE COURT:  That's my understanding.

MR. GIRDHARRY:  Okay.

MR. KIM:  Correct, your Honor.

THE COURT:  Right.  Okay.

Okay.  So I promise I'm going to let you out of here eventually.

I have one more question for the defendants and then

we might take another quick break.  I have a lot to think about.  I don't want to -- you know, don't -- I know attorneys hate hypotheticals.  I hated them, too.  Now I love them.  It's just how it works.

If I issued an order stating just that the defendants must reinstate Mr. Liu in F-1 student status, are the defendants arguing that that wouldn't necessarily require the defendants to accurately reflect that in the SEVIS system?

So, for instance, could the defendants comply with my order and have Mr. Liu in F-1 student status but still terminate -- still have SEVIS reflect terminated?

MR. GIRDHARRY:  In this hypothetical, the Court's order would say reinstate his F-1 student status and not -- and keep the SEVIS record terminated?

THE COURT:  Would just be silent for -- like, for instance, if I want Mr. Liu to have complete temporary relief pending the outcome of this case -- now, I'm trying to preserve remedies so that we can have the time to conduct discovery and all of the reasons that preliminary relief is a consideration in cases.

If I just -- if the preliminary relief only addressed the SEVIS system, from -- based on your arguments today, I'm hearing that that would then not protect him with respect to actual F-1 student status.  And if my relief only addresses his F-1 student status, then that will not address

the SEVIS system.  So I would need to issue an order that addresses both F-1 student status and SEVIS in order to make sure that the SEVIS system accurately reflects his F-1 student status?

MR. GIRDHARRY:  I don't think one -- I think one and three would be correct in this hypothetical.  You said an order that would reinstate him in SEVIS.

THE COURT:  Uh-huh.

MR. GIRDHARRY:  The government's position is that he's still maintaining his status.  So reinstatement in SEVIS would be the relief that he's seeking that we say -- that the government's position is that he's not entitled to, but that reinstating that preliminarily would put him back in the SEVIS system and his status would be what it is right now.

The third scenario -- the second scenario was you said no SEVIS, but F-1 status.  I don't think -- I think that would be an order that we'd request clarification on or --

THE COURT:  Okay.

MR. GIRDHARRY:  -- something along those lines.

And then the third one, I think, was --

THE COURT:  Both.

MR. GIRDHARRY:  -- both, SEVIS and that.  Then I think that would be something that we would be -- half of it would be consistent with what's already the government's position and then the other half would be number -- the number

72

one scenario.

THE COURT:  But if I issued a preliminary injunction that only addressed the SEVIS status, isn't it at least conceivable that the government could revoke his F-1 student status and keep his SEVIS record -- consistent with my order, keep his student -- his SEVIS record active, for lack of a better way to describe it, but revoke his student status and still be in compliance?

Because at the risk of being flip, silly me, I believed that the government would want the record to accurately reflect and manifest the status.  But what I'm hearing from your papers and from your argument is that that's not necessarily the case.  And the basis of the argument from the government today is that it doesn't have to be and there's no reason for me to think that it is.

And so if I want to provide the relief, which would be both an active student status in SEVIS and an actual F-1 student status, I would probably need to issue an order that had both.

Would you agree?  And I'm not -- and I want to make it clear.  I'm not asking you to help me fashion an order that you clearly object to.

MR. GIRDHARRY:  Of course.

THE COURT:  I don't mean it that way.  I'm asking this question as clarification on the government's position of

how these two things work together.

MR. GIRDHARRY: Absolutely. And, again, this is a hypothetical and no one's --

THE COURT: Yes. And your objection to it is absolutely noted.

MR. GIRDHARRY: Thank you, your Honor.

I think -- I think that order would accomplish what you just mentioned.

THE COURT: Uh-huh.

MR. GIRDHARRY: However, again, control of the database is within the authority of Homeland Security and how they want to maintain and conduct the database.

THE COURT: Uh-huh.

MR. GIRDHARRY: And, again, their determination to term -- or their decision to terminate is part of -- is based on that authority. And, again, based on what's before the Court, the declaration specifically, termination has -- the status -- his status has not been terminated.

And so I believe in -- in this hypothetical, in a court order that, I guess, would be adverse to the government, an order that requires similar to the -- well, let me say that an order that requires Mr. Liu reinstated in SEVIS would accomplish what the Court's asking right now.

THE COURT: Okay. Thank you.

Anything further from the plaintiffs?

74

MR. KIM:  Just briefly, not to dispute with my brother, it's just that when we had the temporary restraining order from the Court, after that written order, we consulted with my brother and the defendants did update the SEVIS record and so we hope that that continues with a preliminary injunction order.

But, again, we see the termination of the SEVIS record the same as the F-1 student status termination in this case because of, again, the April 4th, the reasoning of the termination was the failure to maintain status.

THE COURT:  Uh-huh.

MR. KIM:  So if the Court finds that plaintiff satisfied the preliminary injunction, the factors, and grants his motion, then -- then the SEVIS record should be activated, because that's how it functions.  That's the reasoning of the SEVIS record termination as -- equals as F-1 student status in this case.

THE COURT:  So you agree with defense counsel --

MR. KIM:  Yes.

THE COURT:  -- that it's just the SEVIS record.

MR. KIM:  Yes.

THE COURT:  Okay.  Okay.  All right.  We'll take a quick break unless there's anything else counsel would like to say.

MR. KIM:  No, not now, your Honor.

MR. GIRDHARRY:  No, thank you, your Honor.

THE COURT:  Okay.  Five or ten minutes.

(Recess taken from 3:30 p.m. until 3:50 p.m.)

THE COURT:  Okay.  Anything else that the parties would like to put on the record on the issue of the preliminary injunction requested by plaintiffs?

Plaintiffs?

MR. KIM:  No, your Honor.

THE COURT:  Okay.  Defendants?

MR. GIRDHARRY:  Yes, your Honor, if I could, just a couple of things.

THE COURT:  Absolutely.

MR. GIRDHARRY:  Based on the factors required to demonstrate a preliminary injunction, government is arguing that plaintiff has failed to meet those.

And we've discussed some of them here today, but just going quickly, just to put on the record, Mr. Liu's failed to demonstrate irreparable and -- immediate irreparable injury for the reasons in the government's briefing.

Also, the equitable -- the equitable factors do weigh in the government's favor as they relate to the government's ability, as Congress has mandated, to have authority over the immigration process and enforcement in immigration and a decision contrary to that would -- would weigh heavily against the government.

And, also, your Honor, there was a point I wanted to raise about the applicability of 8 U.S.C. 1252(g) and how it's long established that that -- that provision does remove jurisdiction from courts on the ability to prohibit DHS from commencing proceedings against -- against persons.  It's a -- it's a prosecutorial decision that -- under that statutory provision that district courts lack jurisdiction to make a determination on.

THE COURT:  Would you agree that the -- that the requested relief here doesn't directly implicate that?

MR. GIRDHARRY:  I agree, your Honor.

THE COURT:  Okay.

MR. GIRDHARRY:  But to the extent that there's some claim -- it is mentioned a few times in the complaint and in the briefing that fear of -- of proceedings being commenced or fear of detention and things that come with the commencement of issuance of a notice of intent to appear or an NTA, things like that, 1252(g) does strip the Court of jurisdiction, respectfully, to -- to entertain a challenge to that.

And -- and, just quickly, along those lines, a person put into proceedings is provided due process in the immigration judge -- before the immigration judge and to the Board of Immigration Appeals and then to a petition for review with -- directly to the circuit court.

And then, finally, your Honor, the government renews

its request under Rule 65(c) for a -- in the event of an adverse decision against the government for plaintiff to have to put a bond -- put a bond up in accordance with the rule.

THE COURT:  Okay.  Are there any costs and damages that the government -- that the defendants will suffer if they're enjoined from terminating Mr. Liu's F-1 student status or the record in SEVIS?

MR. GIRDHARRY:  I don't have any numbers of front of me that I can answer that question with right now, your Honor.

THE COURT:  Okay.  I did actually have one question for the plaintiffs.

Where is Mr. Liu in the tenure -- I'm sorry -- in the year-specific research performance evaluation criteria?  In document number 10-16, there's a -- it's a Dartmouth document that lists out --

MR. KIM:  Yes.  He is in the second year.

THE COURT:  He's in the second year.  Okay.  I knew he started in September 2023, but --

MR. KIM:  Okay.

THE COURT:  -- I know Dartmouth doesn't follow the, you know --

MR. KIM:  Yes.

THE COURT:  -- typical two-semester --

MR. KIM:  Yes.  And, also, it was a little bit complex because of the sudden termination, not being able to

engage in research.  But because of in light of the TRO, he was able to get back to the research credit.  So it's safe to allege that it's a second year.

THE COURT:  He's in the second year, so he's expected to do at least two research classes.

MR. KIM:  Correct, your Honor.

THE COURT:  Okay.  And he only needs one more nonresearch class to finish his studies at Dartmouth.

MR. KIM:  Correct, your Honor.

THE COURT:  Okay.  Okay.  I think I'm good. Anything else?

MR. KIM:  Your Honor, given that my brother said -- I would just take one minute, your Honor, if I may.

So for -- it kind of goes to both a combination of irreparable harm and hardship and public interest.  I'll just make it in one minute.

Because of the university letter of termination of F-1 student status, prior to the TRO, Mr. Liu was not able to engage in any research and that would have significantly affected his ability to make normal progress in Ph.D. program. And as the evidence shows that if he cannot timely make the Ph.D., putting aside the funding issue, he would be considered as late and the document clearly -- the department policy clearly shows that the department might not be able to accommodate him as Ph.D. student.  So that loss is sufficient,

standing alone, to satisfy the irreparable harm.

For the hardship and public interest, I'm really trying to see what is it that plaintiff did wrong that he deserves to be not being able to study and research.  The only allegation that the defendant made was the incident happening in 2021 in Detroit at the airport.  But at the same time, defendants do not refute or dispute the circumstance and the reasoning and how even the CBP did not either revoke or accused him of having violated any rules.  It was merely the inactivation of the SEVIS record.  And he went back to China and came back without any issue.  And other than -- I don't really see that.

The Congress has explicitly allowed students to study -- international students to study in the United States.  Of course, the students have to follow the regulations, have to comply with the rules, and he has done all of that.  So there is public interest and hardship to be found in his favor.

THE COURT:  Okay.  Thank you.

MR. KIM:  Thank you, your Honor.

THE COURT:  Anything further?

MR. GIRDHARRY:  To belabor the point, your Honor, just to -- on irreparable injury, the government's provided language from the First Circuit and from a court in this jurisdiction that said that failure to demonstrate injury is grounds alone; irreparable injury is grounds alone to deny a

80

preliminary injunction.

And on the record before the Court and everything that was said and just in response, I mean, being able to finish a -- a degree program at one's choice, it is not irreparable injury, though I think we articulated that in the -- in our briefing.

Plaintiff's counsel mentioned Mr. Liu's ability to -- or returning or traveling to his home country and I believe in his declaration he indicated that he -- he accomplished research. He made academic accomplishments while he was there, just demonstrating and supporting the government's argument that that doesn't establish his -- his -- his choice or his -- his desire to -- to pursue or to continue the education at his pace. It doesn't rise to the level of an irreparable injury. Just -- that's it. Thank you, your Honor.

THE COURT: Okay.

MR. KIM: Nothing further from the plaintiff, your Honor.

THE COURT: Okay. All right. Well, you've given me a lot to think about. I want to issue an order that's complete and includes everything that I heard today and so what I intend to do is I intend to extend the temporary restraining order through Friday. So today is Tuesday.

I assume that the government objects.

MR. GIRDHARRY: Yes, your Honor. The government

does object to that.

THE COURT:  Okay.  Do you need to be heard on that?

MR. GIRDHARRY:  No, I don't, your Honor.

THE COURT:  Okay.  I'm going to do it anyway because -- because I do think that the -- that the parties, including the government, deserve a thoughtful, complete order on the issues.

And so I'm going to extend that temporary restraining order just until Friday and I'll issue an order sometime between now and then, as soon as I possibly can, and you'll get that through ECF in the normal course.

Any other issues?

MR. KIM:  Nothing for the plaintiff -- from plaintiff, your Honor.

MR. GIRDHARRY:  Nothing from the government, your Honor.  Thank you.

THE COURT:  Anything else?

THE CLERK:  No.

THE COURT:  Okay.  Court is adjourned.

(Proceedings concluded at 4:00 p.m.)

82

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 4/25/25            /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR